# EXHIBIT A

BOSTON GLOBE SERVICES

CONTACT US | SEARCH

Subscriber

HOME Subscribe    ADVERTISER    SUBSCRIBER    COMMUNITY    N WSROOM    ABOUT U1
                 Customer Service    BOSTON GLOBE REWARDS        Information & Comments

Shop Participating Merchants
Boston Globe Store
Monthly Offers
Globe Photos
Free Globe Archives



September 13, 2004

Privacy Policy

oatou tiNobc Rewards| Free Clot    Archives

Your story is listed below. To refine or expand your search, you can search again.

# BUREAUCRACY AND A BABY

**Author:** BY ADRIAN WALKER
**Date:** 03/04/2004  **Page:** B1  **Section:** Metro/Region

ADRIAN WALKER
NORFOLK - Jim *Chaplin* sees his son, Lyndon Yeager *Chaplin,* once a week in visits supervised by the Department of Social Services. On one of his recent visits, he maintains, it was clear that his 7-week-old son was not being properly taken care of in his foster home.

By normal standards, that would qualify as an outrage. But it is among the milder, outrages in young Yeager's life in which a state agency has taken over his care even though many of its reasons for doing so are - at best - suspect.

A few days after Yeager was born, DSS took custody of the baby. Even senior DSS officials now concede that they may have acted in haste, though they do not say what they plan to do about it.

"I've learned too many hard ways in this business that quick and precipitous judgment is the worst enemy of good child welfare work," DSS Commissioner Harry *Spence* said last week "You have to constantly stay open to new evidence."

Jim *Chaplin* is a pilot from Alaska. His girlfriend, Janice Brantley, is a native of Alaska. According to *Chaplin,* Brantley has a history of mental instability. She has four other children, but has custody of none of them. *Chaplin's* sister, Lori Hurley, lives in Norfolk and had befriended Brantley, and the couple came here to have the baby because Massachusetts offered a more stable and supportive environment than Alaska.

Apparently, when social workers at the hospital began to suspect that there was no clear plan for how the child would be raised and where, they got concerned and called in DSS.

Hours before giving birth, Brantley was asked by social workers to take a drug screen. She refused, and left the hospital while in labor. She came back after about an hour, and her delivery went smoothly five hours after that.

By that time, the parents were well on their way to a court case. Brantley was unresponsive when social workers came in asking more questions about how she planned to raise the baby.

"Janice was cornered," Hurley said. "And she was told they were taking the

baby without her. Yes, she was standoffish. But if you told me you were taking my child I would be standoffish also."

Now, if a child is born to two people who are separated, and one of them is deemed to be an unfit parent, you might reasonably conclude that the other parent - or a close relative - would take custody. In this case, your common sense would lead to the wrong conclusion.

The abuse and neglect order DSS filed was based on two factors. First, they said their Alaskan counterpart, the Office of Children's Services, had informed them that *Chaplin* was a drug user. Second, they maintained Hurley had attempted to illegally put the baby up for adoption. If the first claim were true, that would render *Chaplin* an unfit parent. The second would mean that the baby could not be placed with Hurley.

But, the official whom DSS contacted in Alaska has filed a formal affidavit in Norfolk Juvenile Court flatly stating that he never told DSS any such thing about *Chaplin.* As for an adoption, both the person supposed to have been adopting the baby and the attorney who was supposedly arranging it have also both sworn that nothing of the sort ever took place. Either multiple witnesses are perjuring themselves, or DSS has this all very wrong. A DSS spokesman said the agency plans to ask in a court hearing today to retain custody of the child "for now."

*Spence* and other DSS officials said last week there is disagreement within the agency over whether it has done the right thing by young Yeager *Chaplin.* According to agency spokeswoman Denise Monteiro, one DSS social worker who has observed *Chaplin's* supervised visits reported, "He's so appropriate with the child. His interaction with the child was something that was endearing and noticeable to the staff."

So far that has not been enough to overcome an intransigent bureaucracy. I spoke to the baby's mother in Alaska by phone. She sounded weary. "I just want my baby back, my boyfriend back, and my life back."

Adrian Walker is a Globe columnist. He can be reached at walker@globe.com.

All content herein is © Globe Newspaper Company and may not be republished without permission.

00

BOSTON GLOBE SERVICES    CONTACT US | SEARCH    Subscriber

HOME | A | SUBSCRIBER | COMMUNITY | NEWSROOM | ABOUT, U1
Subscribe    Customer Service    $OS"ON GLOBE REWARDS    Information & Comments

LOGOUT

Shop Participating Merchants
Boston Globe Store
Monthly Offers
Globe Photos
Free Globe Archives



September 13, 2004

Privacy Policy

+!-,o.ltottOtotho' **Rewards**ɪFree Globe**Archives**

Your story is listed below. To refine or expand your search, you can search again.

## ACCURACY ABOUT A CUSTODY BATTLE

**Author: Date:** 03/29/2004  **Page:** Al 0  **Section:** Letters

LETTERS TO THE EDITOR ADRIAN WALKER'S MARCH 4 COLUMN NOT ONLY FAILED TO FULLY AND ACCURATELY REPORT THE CIRCUMSTANCES OF THE CUSTODY BATTLE FOR LYNDON YEAGER *CHAPLIN,* ɪT ALSO FAILED TO ACCURATELY REPORT MY COMMENTS ON THE CASE ("BUREAUCRACY AND A BABY," CITY & REGION).
I never expressed doubt about the handling of the controversy by the Department of Social Services' Arlington office. I believe that it acted thoughtfully and deliberately for the safety and well-being of the child.

I only expressed uncertainty about what position we at DSS would take in the upcoming court case on custody, given the outstanding uncertainties about both mother and father.

Walker made a classic child welfare error: He became over-invested in his beliefs about the father, and then refused to take in new data that should have prompted a reconsideration of those beliefs.

But when Walker makes an error, the only consequence is a bad newspaper column. When we make an error, the result can be fatal.

LEWIS *H.* **SPENCE**

Commissioner Department of Social Services Boston

All content herein is © Globe Newspaper Company and may not be republished without permission.
00