UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                 )
JAMES CHAPLIN,                   )
     Plaintiff                   )
                                 )
v.                               )      C.A. NO. 04-11751-GAO
                                 )
LEWIS H. SPENCE, et al.,         )
     Defendants                  )
                                 )
_____)

DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

I.  **Introduction**

Plaintiff James Chaplin (hereinafter "Chaplin"), a resident of Alaska, has brought a four count Complaint pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331,[1] seeking monetary damages against Lewis H. Spence, the Commissioner of the Massachusetts Department of Social Services ("DSS"), Barbara A. Hawkes Sullivan, a DSS supervisor, and Noreen D. Chabot, a DSS caseworker.  In Counts I, III, and IV, Chaplin claims that all three defendants violated his rights to federal due process by initiating and then pursuing a neglect petition in Norfolk County Juvenile Court, thereby depriving him for three months of the custody of his newborn child.  In Count II, Chaplin claims that Commissioner Spence invaded his privacy and defamed

_____
[1]     Complaint, General Allegations, ¶ 5.

-2-

him by the mention of his child's name in a published
response to a <u>Boston Globe</u> editorial which was critical of
DSS.

Defendants are entitled to summary judgment on all
counts.  The defendants had ample grounds for "reasonable
suspicion" to file a neglect petition and obtain temporary
custody of Chaplin's child.  Even had they had not
possessed such "reasonable suspicion," they were entitled
to absolute immunity and cannot be found liable.  As for
the claim solely against the defendant Commissioner Spence
did not invade Chaplin's privacy.  His child's name had
already been published in the press, Spence did not divulge
any new, "highly personal or intimate" facts, and the
interest of the public outweighed Chaplin's right to
privacy.  Nor did Spence defame Chaplin because his
statement was not knowingly untrue, malicious, and would
not hold up Chaplin to ridicule.  It was, in any event,
conditionally privileged.

## II.  <u>Statement Of Material Facts Not In Genuine Dispute</u>

The following numbered material facts are not in
genuine dispute:

-3-

1.   On January 10, 2004, Janis Brantley ("mother") gave birth to Baby Boy Brantley, later known as Lyndon Yeager Chaplin ("Lyndon")[2] at Caritas Norwood Hospital in Norwood, Massachusetts ("the hospital").  James Chaplin ("Chaplin") is the father and the plaintiff in this action.

2.   On the date of Lyndon's birth, hospital physician Bruce Weinstock wrote in the "Plans/Recommendations" section of his chart that a 51A report for neglect should be filed "if mother refuses [a social worker] consult," and that he should be notified if no one else was filing it.[3]

3.   On the following day, January 11, 2004, a social worker at the hospital, a mandated reporter pursuant to G.L. c. 19C, § 1, phoned in a 51A Child Abuse and Neglect report to the DSS hotline.[4]  As required of a mandated reporter by G.L. c. 19C, § 10, the social worker

---

[2]   Child was initially known as "Baby Boy Brantley" due to the fact that Chaplin was not married to mother.

[3]   Physician's Record Of Newborn Infant, a copy of which is annexed as Exhibit A.  (Plaintiff's Complaint mistakenly states child's birth date as January 11, 2004.  Complaint, Factual Allegations, ¶ 1.)

[4]   Child Abuse/Neglect Report, a copy of which is annexed as Exhibit B.

-4-

memorialized his report in writing and submitted it to DSS
within 48 hours.[5]

    4.  Erin Murphy at the DSS Child At Risk Hotline
received the social worker's oral report.  The social
worker told Murphy that, according to Chaplin, mother
suffered from a significant multiple personality disorder
and paranoia, and that she had been prescribed anti-
psychotic drugs which she was no longer taking.  He also
said that mother had a history of alcohol and cocaine abuse
as well as assaultive behavior, that she had undergone 10
abortions, and that 4 children to whom she had given birth
were not residing with her but rather with their father.
The social worker reported that a psychiatrist at the
hospital had confirmed that mother had a poly-substance
abuse problem and a multiple personality disorder.  The
social worker further advised that earlier, on the same day
that mother gave birth to Lyndon, she had for a time left
the hospital against medical advice rather than submit to a
toxicity screen or speak with a social worker.  Also of
concern to the social worker was that mother's intentions
as to Lyndon's care and custody were "poorly defined."

---

[5]     Report of Child(ren) Alleged to be Suffering From
        Serious  Physical or Emotional Injury by Abuse or
        Neglect, a copy of which is annexed as Exhibit C.

-5-

Prior to his birth, she had thought about aborting the pregnancy, then giving custody to Chaplin or to his sister Lori Hurley, or giving the child up for adoption.  The social worker viewed mother as impulsive and feared that she might leave the hospital with Lyndon.[6]

5.    On the basis of this information, defendant DSS supervisor Barbara A. Hawkes Sullivan ("Sullivan") approved a non-emergency 10-day DSS investigation into what were deemed allegations of neglect.[7]  On January 12, 2004, the investigation was assigned to defendant DSS caseworker Noreen D. Chabot ("Chabot").[8]

6.    Chabot commenced the investigation the same day by contacting the hospital where, in the absence of the social worker who had made the mandated reporter, she spoke to Terri Hoitt, another licensed social worker.  Hoitt confirmed and supplemented the information that had previously been provided by the mandated reporter.  Hoitt advised Chabot that mother was an Alaskan Native-American Indian from Yakutat, Alaska, who had moved around the area frequently but resided with Chaplin, an airplane pilot, at

---

[6]    Exhibit B.

[7]    Id.

[8]    January 13, 2004, Affidavit of Noreen D. Chabot, a copy of which is annexed as Exhibit D.

-6-

International Airport Road in Anchorage. Mother had spoken
of leaving the hospital and taking Lyndon back to Alaska,
where she might keep the baby or give it to her sister.
The hospital was aware, however, that Chaplin's sister had
taken steps to arrange for the child's private adoption
with a woman from New Hampshire who had met mother prior to
Lyndon's birth and who repeatedly called the hospital since
Lyndon's birth. Chaplin had told the hospital that he and
mother had agreed on a plan for the child's adoption and
had discussed it "for a long time." Hoitt said she felt
that mother and Chaplin were a flight risk.[9]

    7.    On the same day that Chabot spoke with Hoitt,
Sullivan spoke with Christopher Morgan, a Child Protective
Services Worker in Alaska. Morgan said that he was very
familiar with mother and her extended family and that he
also knew of Chaplin. Morgan confirmed that mother came
from a remote Yakutat Native-American Indian village of
approximately 600 people accessible primarily by airplane.
Morgan believed that mother was employed as an exotic
dancer in Anchorage, that she was cocaine involved, and
that she had left three of her sons – aged 6, 12, and 15 –
with Ben Rockwood, the father of one of them and an

---

[9]    Id.

-7-

alcoholic.  When Rockwood required inpatient treatment,
mother did not resume the care of her sons and they had to
be placed by Alaskan Children's Protective Services.  This
had happened on a number of previous occasions on account
of mother's physical abuse and neglect.  Morgan provided
Chabot with the names of two tribal representatives in the
Yakutat community so that DSS could take steps to comply
with the Federal Indian Child Welfare Act.[10]

   8.   On January 13, 2004, Chabot went to the hospital
and personally interviewed Chaplin.  He reiterated that
mother suffered from mental disorders.  He said that two of
her pregnancies had been with him and had been aborted
because he believed that she was using cocaine.  He said
that he was not sure about plans as to Lyndon or his
interest in maintaining custody.  He confirmed that prior
to Lyndon's birth, he and mother had met with a woman from
New Hampshire whom he knew was interested in adopting their
yet unborn child, although mother had been not been told of
her interest.[11]

   9.   When Chabot then sought to bring in mother to
further discuss what would happen to Lyndon, mother said

_____

[10]   Id.

[11]   Id.

-8-

that she did not want to discuss Lyndon's care and custody,
quickly terminated the interview, and left the room.[12]

10.  On the basis of this and additional information
incorporated in her affidavit, Chabot, with the approval of
Sullivan, filed in Norfolk Juvenile Court an ex parte care
and protection petition together with affidavit seeking
emergency custody of Lyndon pursuant to G.L. c. 119, § 24.[13]

11.  After consideration of Chabot's petition and
affidavit, Judge Mary M. McCallum determined that "DSS or
its agent's efforts prior to removal were reasonable"[14] and
continued the petition and ordered that Lyndon be committed
to DSS until January 15, 2004, pending further hearing.[15]

12.  A series of court events followed, including:  on
January 15, Judge McCallum's appointment of counsel for
Lyndon and mother, and a motion to intervene by an Alaskan
Native Tribe known as the Kotzebue; on January 29, a motion
for temporary custody, filed by an attorney on behalf of

---

[12]  Id.

[13]  Dedham Juvenile Court Docket Sheet, a copy of which is
annexed as Exhibit E.

[14]  Id.

[15]  1/13/04 Care and Protection Temporary Mittimus, a copy
of which is annexed as Exhibit F.

-9-

Chaplin,[16] and a separate motion for temporary custody filed

by Chaplin's sister, Lori Hurley;[17] and, on February 4,

2004, a petition for the transfer of proceedings to Alaska

filed by the Kotzebue.[18]

13.   After hearings on February 5 and 12, 2004, Judge

Joseph F. Johnston declined to transfer jurisdiction to the

Tribal Court in Alaska because mother was not a resident in

a tribal area.  He, nonetheless, ordered transfer of the

case to Alaska civil court because both parents were

residents of Alaska and all of the relevant information

about mother was there.[19]

14.   On March 2, 2004, Chaplin filed a Second Motion

To Dismiss DSS's petition through his new counsel, Edward

J. McCormick, III[20] and two days later, on March 4, 2004,

the Boston Globe published on the front page of its

Metro/Region section an editorial by Adrian Walker entitled

"BUREAUCRACY AND A BABY."  Referring to Lyndon by his full

name, Lyndon Yeagher Chaplin, Walker questioned why DSS had

---

[16]   Exhibit E.

[17]   Id.

[18]   Id.

[19]   Findings and Order on Sua Sponte Motion to Transfer
Jurisdiction to the Appropriate Alaska State Court, a
copy of which is annexed as Exhibit G.

[20]   Id.

-10-

taken over the care of Lyndon when his father had been
deemed "so appropriate with the child" and when Lyndon
might better have been placed with Lori Hurley, Chaplin's
sister.  Walker suggested that Chaplin was the source of at
least some of his information, writing that "[a]ccording to
Chaplin, [mother] has a history of mental instability.  She
has four other children, but has custody of none of them."
Walker also wrote that senior officials at DSS "now
conceded that they may have acted in haste," and he implied
that Commissioner Spence was among them, by quoting,
without context, Spence's stated opinion that "quick and
precipitous judgment is the worst enemy of good child
welfare work."[21]

15.  On March 4, 2004, DSS filed with the Court the
Report required by G.L. c. 119, § 24, and after temporary
custody hearings on March 8 and 9, 2004, Judge Johnston
entered Amended Findings and an Order transferring
jurisdiction to the Alaska Superior Court with DSS to file
a notice with the Clerk Magistrate as to the outcome.[22]

---

[21]    A copy of Adrian Walker's editorial is annexed as
Exhibit H.

[22]    Exhibit E.

-11-

16.  On March 8, 2004, Chapin filed in Probate Court to obtain custody of Lyndon.[23]

17.  On March 11, 2004, Chaplin was awarded temporary custody of Lyndon by the Alaskan Superior Court, and on March 16, 2004, Judge Johnston entered a judgment dismissing the petition.[24]

18.  On March 29, 2004, the Boston Globe published a Letter to the Editor from Commissioner Spence.[25]  To identify the now three-week-old article to which he was responding, Spence repeated Lyndon Yeagher Chaplin's name, with the stated purpose of correcting the record.  He pointed out that Walker had "not only failed to fully and accurately report the circumstances of the custody battle for Lyndon Yeagher Chaplin [but] also failed to accurately report" Spence's comments on the case.  Spence explained that his stated uncertainty had nothing to do with handling of the case by DSS's Arlington office, as Walker had suggested, but rather reflected his uncertainty as to what position DSS should take in the future "given the outstanding uncertainties about both mother and father" as

---

[23]  Id.

[24]  Id.

[25]  A copy of Spence's Letter to the Editor is annexed as Exhibit I.

-12-

well as "new data that should have prompted a
reconsideration of [Walker's] beliefs."  Spence did not
disclose exactly what new data he was referring to in his
Letter to the Editor nor did he suggest, much less state,
that <u>he</u> had disclosed any such new data to Walker.

**III.  <u>Argument</u>**

    **A.    The Defendants Did Not Violate Chaplin's Federal
       Due Process Rights.**

Chaplin alleges in Counts I, III, and IV of his
Complaint that Spence, Chabot, and Sullivan violated his
federal due process rights by depriving him of the custody
of Lyndon from January 12 to March 25, 2004, while knowing
"that there was no credible evidence to support any
allegation of unfitness as a parent on behalf of the
plaintiff, James Chaplin."[26]  In fact, the question of
Lyndon's custody did not revolve around the rights of
Chaplin, but rather the welfare of the child.  At the time
the defendants sought and obtained an emergency <u>ex parte</u>
order of temporary custody, the defendants were simply
alleging that Lyndon was a child in need of care and
protection.  The defendants did not violate Chaplin's right
to due process and cannot be found liable on that basis

---

[26]    Complaint, §§ 4-5, 17.

-13-

because they acted on "reasonable suspicion" that the safety of the child was at risk.

The federal due process clause protects the interest of parents in the care, custody and control of their children. Troxel v. Granville, 530 U.S. 57, 65 (2000). However, in cases where the safety of the child is at risk, the rights of parents are not absolute. Tower v. Leslie-Brown, 326 F.3d 290, 298 (1st Cir. 2003); Suboh v. Dist. Attorney's Office, 298 F.3d 81, 91 (1st Cir. 2002). Thus, it has been held that parents have stated no due process violation "if there existed a reasonable suspicion that abuse had occurred or that a threat of abuse was imminent at the time of the removal." Hatch v. Department for Children, Youth and Their Families, 274 F.3d 12, 22 (1st Cir. 2001).

There was ample objective basis for the defendants to believe that there was such a risk to Lyndon. Ironically, it was Chaplin, himself, who was among the first and most insistent in saying so. Defendants subsequently learned, without contradiction, and often from a number of different sources, that mother was suffering from a significant multiple personality disorder and paranoia, for which she had been prescribed anti-psychotic drugs and which she no

-14-

longer was taking.  Mother had a history of alcohol and
cocaine abuse, refused a toxicity screen, and left the
hospital against medical advice just before the birth of
Lyndon.  According to Chaplin, she had discussed the
child's adoption "for a long time" prior to his birth.  She
had previously left three of her children, aged 6, 12, and
15, with the alcoholic father of only one of them.  Later,
when he required in-patient treatment, mother chose not be
involved and the children were placed by Alaska's Children
Protective Services.

     Defendants had good reason to think that the threat to
Lyndon's safety was imminent.  Mother was thought by the
social worker to be impulsive.  Chaplin had said that one
feature of mother's mental instability was paranoia.

     Although his Complaint suggests otherwise, when the
defendants first sought temporary custody on January 13,
2004, Chaplin did not propose or otherwise suggest himself
as an alternative.  Indeed, he was telling the hospital
that he and mother had agreed to the child's adoption.  He
had not made any arrangements to care for Lyndon separate
and apart from mother.  To the contrary, by bringing mother
to Massachusetts he most likely was only intending to
facilitate adoption by his sister in Norfolk or some woman

-15-

from New Hampshire not affiliated with any licensed adoption organization.  Chaplin's ambivalence was confirmed by the fact that, despite his presence in court on January 15 when DSS was awarded temporary custody, he did not move for temporary custody until two weeks later on January 29. This coincided with his sister filing her own, separate motion for temporary custody of Lyndon.

Chaplin may well argue that as time went on and he was able to form a relationship with Lyndon, he was more ready and willing to assume sole custody.  However, by that time the matter was in the court's hands and the defendants were entitled to absolute immunity.

Absolute immunity is designed to protect participants in adjudicatory proceedings.  Although social workers will not be entitled to absolute, as opposed to qualified, immunity when "acting unilaterally prior to the operation of the judicial process," they are analogized to prosecutors, and will be granted absolute immunity when they are "performing the function of initiating dependency proceedings against parents suspected of child abuse." Salyer v. Patrick, 874 F.2d 374, 378 (6th Cir. 1989). Accord Vosburg v. Department of Social Servs., 884 F.2d 133 (4th Cir. 1989); Meyers v. Contra Costa County Dept. of

-16-

Social Servs., 812 F.2d 1154, 1157 (9th Cir. 1987), cert.

denied, 484 U.S. 829 (1987).

As the Court of Appeals for the First Circuit has

noted, "it is well established that public officers possess

absolute immunity for activities that are intimately

associated with the judicial process." Frazier v. Bailey,

957 F.2d 920, 931 n. 12 (1st Cir. 1992)(emphasis in

original)(citations omitted).  Further, lower courts have

provided social workers and other public officials with

absolute immunity for actions involving the initiation and

prosecution of child custody or dependency proceedings.

Id., citing Millspaugh v. County Dep't of Public Welfare,

937 F.2d 1172, 1176 (7th Cir. 1991)(social worker immune

from suit for failure to furnish information to the court

and pursuing litigation after parents were clearly entitled

to custody); Stem v. Ahearn, 908 F.2d 1, 6 (5th Cir.

1990)(social worker possesses absolute immunity when

testifying at a child-custody hearing); Meyers, 812 F.2d at

1156-57 (social workers immune as quasi-prosecutorial

officers when initiating child dependency proceedings);

Malachowski v. City of Keene, 787 F.2d 704, 712-13 (1st

Cir. 1986), cert. denied, 479 U.S. 828 (1986)(juvenile

officer immune from damages when initiating juvenile

-17-

delinquency proceeding); Kurzawa v. Mueller, 732 F.2d 1456,

1458 (6th Cir. 1984)(guardian ad litem retains absolute

immunity to enable him to act in the best interest of the

child; psychiatrists providing information to court

entitled to absolute immunity as functionally analogous to

witnesses).

This Circuit's reasoning in Malachowski v. City of

Keene, is instructive.  It held that a police officer was

absolutely immune from personal liability for filing an

allegedly false petition to initiate juvenile delinquency

proceedings.  Malachowski, 787 F.2d at 712.  As the court

explained it, the initiation of a juvenile delinquency

proceeding by a juvenile officer was not an "investigative"

activity, but rather an activity "intimately associated

with the judicial phase of the criminal process...to which

the reasons for absolute immunity apply with full force."

Id., citing Imbler v. Pachtman, 424 U.S. 409, 430 (1976).

A juvenile officer "must be free from the threat of

harassment and intimidation in his decision to initiate

juvenile delinquency proceedings." Id.

The same reasoning would apply with full force to the

defendants here.  Even if they had acted as alleged –

"knowlingly, intentionally, and deliberately" – they were

-18-

intimately involved with the judicial process pursuant to
G.L. c. 119, § 51B.  Just as in a juvenile delinquency
proceeding, if not more so, they must be free from the
threat of harassment and intimidation in their decision to
seek the emergency custody of children whose safety and
welfare they deem is at imminent risk.

**B.    The Defendants Are Entitled to Qualified Immunity**

Even assuming that the defendants violated Chaplin's
federal due process rights and that the defendants were not
entitled to absolute immunity, they would still not be
liable on grounds of qualified immunity.  Defendants'
actions were not contrary to "'clearly established' rights
of which 'a reasonable person would have known.'"
Ringuette v. City of Fall River, 146 F.3d 1, 5 (1st Cir.
1998), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818
(1982).

Chaplin has no evidence from which a jury could
rationally find that the defendants "knowingly,
intentionally, and deliberately" misrepresented Chaplin as
an unfit parent.  At worst, the defendants were mistaken in
concluding that Chaplin's toying with adoption and
ambivalence about maintaining custody constituted

-19-

"reasonable suspicion" sufficient to justify their seeking
DSS custody.

   The law has not been clearly established that such
ambivalence, with an unfit mother and the potential for an
unlicensed adoption in the offing, would not constitute
"reasonable suspicion" sufficient to seek removal of a
child.  The defendants may have made a mistake in judgment.
However, qualified immunity gives "ample room for mistaken
judgment by protecting all but the plainly incompetent or
those who knowingly violate the law."  Hunter v. Bryant,
502 U.S. 224, 227 (1991); see also Saucier v. Katz, 533
U.S. 194, 205 (2001)("[I]f the officer's mistake as to what
the law requires is reasonable...the officer is entitled to
the immunity defense"); Brennan v. Hendrigan, 888 F.2d 189,
192 (1st Cir. 1989) (noting "perfection is neither expected
nor required").  The defendants cannot be said to have been
plainly incompetent or to have knowingly violated the law.
Indeed, the findings of two different judges of the Norfolk
Juvenile Court imply just the contrary.  Accordingly, the
defendants are entitled to qualified immunity and Chaplin's
due process claims must fail.

-20-

**C.   The Commissioner Did Not Invade Chaplin's Right To Privacy Nor Defame Him.**

Chaplin alleges in Count II of his Complaint that Spence invaded his privacy by disclosing Lyndon's name and then libeled him by maliciously suggesting his parental unfitness in a published letter to the editor of the Boston Globe.  Spence did not invade Chaplin's privacy.  Lyndon's name had already been published in the Boston Globe and Chaplin's interest in privacy was more than outweighed by legitimate public concern.  Chaplin was not libeled because Spence's words were not false, objectively defamatory, or malicious.

### 1.  Invasion of Privacy

To sustain a claim for invasion of privacy, the invasion must be both unreasonable and substantial or serious.  Nelson v. Salem State College, 446 Mass. 525, 536 (2006).  A plaintiff must show that: (1) the defendants published private facts of a "highly personal or intimate nature," and (2) the facts concerned a matter that is not of legitimate concern to the public.  See Bratt v. Int'l Business Machs. Corp., 392 Mass. 508, 518 (1984); Boston Herald, Inc., v. Sharpe, 432 Mass. 593, 612 (2000).

-21-

Chaplin's claim satisfies neither of these criteria.
In the first place, Spence did not divulge any new or
"highly personal or intimate" facts.  Spence did no more
than identify Chaplin's son by name.  He did no more than
reference an article which had appeared several weeks
earlier.  Where the information is already public, one is
"not liable merely for giving further publicity to that
information."  Jones v. Taibbi, 400 Mass. 786, 801 (1987).

In the second place, the public would be legitimately
concerned to know that the DSS was not, as represented by
Walker, an "intransigent bureaucracy" insensitive to the
welfare of children or the rights of parents.  When, as
here, "the public interest in obtaining information
substantially outweighs the seriousness of any invasion of
privacy, the private interest in preventing disclosure must
yield to the public interest."  Attorney Gen. v. Collector
of Lynn, 377 Mass. 151, 156 (1979).  Judicial proceedings
are by definition a subject of inherent interest and
concern to the public, even when they concern such intimate
issues as paternity.  Peckham v. Boston Herald, Inc., 48
Mass. App. Ct. 282, 289 (1999).

-22-

## 2.  Chaplin's Defamation Claim Cannot Stand

To establish defamation, a plaintiff must prove that the words used were false and would "tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community."  Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 853 (1975).  An objective test – a reasonable recipient's understanding of the words rather than the speaker's intent – is used to determine whether words are defamatory or not.   New England Tractor-Trailer Training, Inc. v. Globe Newspaper Co., 395 Mass. 471, 479-80 (1985), citing Economopoulos v. A.G. Pollard Co., 218 Mass. 294, 297 (1914)(no defamation where purported defamatory meaning only understood by plaintiff).

Chaplin claims defamation arising out of Spence's statement that Walker, the Globe columnist, "became over-invested in his beliefs about the father, and then refused to take in new data that should have prompted a reconsideration of those beliefs."  Chaplin fails to produce any evidence on which a reasonable jury could find that the data Spence relied upon was knowingly untrue. Chaplin also artfully fails to quote the passage in its full context, a context which reveals no basis to find the

-23-

passage objectively defamatory or malicious.  Instead, the
passage in context represents nothing but a carefully
reasoned attempt by a chief executive to defend the staff
and the purpose of the agency he directs.

Finally, even if Spence's letter were reasonably
susceptible defamatory interpretation, it would not be
actionable.  Statements made by public officials while
performing their official duties are conditionally
privileged, Vigoda v. Barton, 348 Mass. 478, 483-85 (1965),
unless they involve actual malice, Tosti v. Ayik, 386 Mass.
721, 726 (1982), or there is "unnecessary, unreasonable, or
excessive publication."  Galvin v. New York, 341 Mass. 293,
297-98 (1960).

Spence's letter was written in the performance of his
official duties, as he makes clear identifying himself as
DSS Commissioner.  The language of the letter betrayed
nothing objectively malicious.  As stated, its purpose was
merely to correct the author's failure to fully and
accurately report his comments on the case.  It was hardly
"unnecessary, unreasonable, or excessive."  There had been
a public allegation of bureaucratic intransigence, if not
incompetence.  This necessarily and reasonably required a
response from the Commissioner.  He did not deal with it

-24-

excessively in as much as his response was only seven
sentences in length and marked in its professional tone.

III. **Conclusion**

    For all the above reasons, summary judgment should be
entered in favor of the defendants.

                         Respectfully submitted,

                         DEFENDANTS LEWIS H. SPENCE, NOREEN
                         D. CHABOT, and BARBARA A. HAWKES
                         SULLIVAN,

                         By their Attorneys,

                         THOMAS F. REILLY
                         Attorney General

                         **/s/ Charles M. Wyzanski**
                         Charles M. Wyzanski
                         Assistant Attorney General
                         B.B.O. No. 536040
                         One Ashburton Place
                         Boston, MA. 02108
                         Tel.No. (617) 727-2200

**/s/ Andrew G. Scott**
Andrew G. Scott
Rule 3:03 Certified