**Condensed Transcript**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES CHAPLIN,

        Plaintiff,

vs.

                                        CIVIL ACTION NUMBER:
                                          04-11751-GAO

LEWIS H. SPENCE, NOREEN D. CHABOT,
and BARBARA A. HAWKES SULLIVAN,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**LEWIS H. SPENCE**

July 21, 2006
2:36 p.m.

Conference Room:  Room 1
141 Portland Street, Suite 200
Boston, Massachusetts

Lauren Sullivan, Notary Public, Professional Shorthand Reporter
within and for the Commonwealth of Massachusetts



**Jack Daniel**
**Court Reporting & Video Services**
Technologies you can use • Experience you can Trust
141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

| 1 | 3 |
|---|---|
| | 1  DEPOSITION OF LEWIS H. SPENCE |
| | 2  JULY 21, 2006 |
| | 3  PROCEEDINGS: |
| | 4  LEWIS H. SPENCE, the |
| | 5  deponent, having been satisfactorily |
| | 6  identified and duly sworn by the Notary |
| | 7  Public, was examined and testified as |
| | 8  follows: |
| | 9  EXAMINATION |
| | 10  BY-MR.McCORMICK: |
| | 11  Q.  Good afternoon, sir.  My name is |
| | 12  Mr. McCormick, I'm an attorney who |
| | 13  represents the plaintiffs in this matter. |
| | 14  Would you state your name, please. |
| | 15  MR. WYZANSKI:  Excuse me, |
| | 16  one second.  Do you want to engage in the |
| | 17  usual stipulations? |
| | 18  MR. McCORMICK:  Thank you, |
| | 19  Counsel.  Same stipulations we've had at |
| | 20  previous depositions, the usual |
| | 21  stipulations, those being that all motions |
| | 22  to strike, except for all objections |
| | 23  except for motions to strike and -- will |
| | 24  be reserved till time of trial. |

| 2 | 4 |
|---|---|
| 1  APPEARANCES: | 1  MR. WYZANSKI:  And we'll |
| 2 | 2  waive the notary, but have Mr. Spence |
| 3  ON BEHALF OF PLAINTIFF: | 3  sign? |
| 4  EDWARD J. McCORMICK, III, ESQUIRE | 4  MR. McCORMICK:  30 days? |
| 5  McCormick & Maitland | 5  MR. WYZANSKI:  30 days. |
| 6  Suite Six - Hayward Manor | 6  MR. McCORMICK:  Okay. |
| 7  195 Main Street | 7  BY MR. McCORMICK: |
| 8  Franklin, Massachusetts 02038 | 8  Q.  Would you state your name, please. |
| 9  508.520.0333 | 9  A.  Lewis, L-E-W-I-S, H. Spence, |
| 10  Ejmccormick@mcandmlaw.com | 10  S-P-E-N-C-E. |
| 11  . | 11  If I go too fast at any point, |
| 12  ON BEHALF OF DEFENDANT: | 12  tell me. |
| 13  CHARLES M. WYZANSKI, ESQUIRE | 13  Q.  Mr. Spence, have you ever had your |
| 14  Office of the Attorney General | 14  deposition taken before? |
| 15  One Ashburton Place | 15  A.  Yes, I have. |
| 16  Boston, Massachusetts 02108 | 16  Q.  So you know I'm going to be asking |
| 17  617.727.2200 | 17  you a series of questions.  There are just |
| 18  . | 18  a couple of ground rules I'll go over |
| 19  ALSO PRESENT: | 19  anyway, even though you've gone through |
| 20  ANDREW G. SCOTT | 20  this before. |
| 21  GEORGE A. KREBS | 21  You need to respond verbally.  As |
| 22  . | 22  you know, the court reporter can't take |
| 23  . | 23  down any nonverbal response.  If at any |
| 24  . | 24  time you don't understand my question, |



**JACK DANIEL**
**Court Reporting & Video Services**
Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

| 5 | 7 |
|---|---|
| 1 please let me know, I'll try to rephrase<br>2 the question. However, if you answer the<br>3 question, it will be assumed that you<br>4 understood it. And of course, if at any<br>5 time you need a break for any reason, to<br>6 confer with counsel or for anything else,<br>7 just let us know.<br>8    A. Okay.<br>9    Q. Okay. How old are you, sir?<br>10   A. 59 years old.<br>11   Q. And where do you presently reside?<br>12   A. In Boston. 25 Concord Square,<br>13 Boston, Mass.<br>14   Q. And where are you presently<br>15 employed?<br>16   A. I'm currently employed at the<br>17 Department of Social Services of the<br>18 Commonwealth of Massachusetts.<br>19   Q. And in what position are you with<br>20 the DSS?<br>21   A. I'm the commissioner of the<br>22 department.<br>23   Q. If I use the abbreviation DSS for<br>24 purposes of this deposition, would you -- | 1 for five years. Would you give us your<br>2 employment history going backwards, if you<br>3 can, prior to DSS?<br>4   A. So starting from the present and<br>5 going back?<br>6   Q. Surely.<br>7   A. Prior to being commissioner of the<br>8 Department of Social Services, I was a<br>9 consultant to the college board, National<br>10 Education Organization, for a couple of<br>11 years.<br>12    Prior to that, I was deputy<br>13 chancellor of schools for operations for<br>14 the city of New York. That started in<br>15 1995. Prior to that, I was receiver for<br>16 the city of Chelsea in bankruptcy from<br>17 roughly 1990 to 1995. Prior to that, I<br>18 was a lecturer in public policy at the<br>19 Kennedy School of Government for two years<br>20 or so.<br>21    Prior to that, I was employed by --<br>22 actually I was a consultant for close to a<br>23 year doing work with energy companies.<br>24 Prior to that, I was vice president for |

| 6 | 8 |
|---|---|
| 1   A. Yep.<br>2   Q. -- be okay?<br>3   A. We can agree on that.<br>4   Q. How long have you been the<br>5 commissioner of DSS?<br>6   A. It will be five years in the end<br>7 of November.<br>8   Q. And what is your educational<br>9 background since high school?<br>10   A. Since high school, I have a BA from<br>11 Harvard College and JD from Harvard Law<br>12 School.<br>13   Q. In what year did you receive your<br>14 JD?<br>15   A. I got my JD in 1974.<br>16   Q. And are you a member of the bar of<br>17 the Commonwealth of Massachusetts?<br>18   A. No, I'm not. Never -- never have.<br>19 Never have entered the bar, proud to say.<br>20    MR. WYZANSKI: A wise man.<br>21    MR. McCORMICK: There are<br>22 those who have never left.<br>23    BY MR. McCORMICK:<br>24   Q. You've been the commissioner of DSS | 1 hotel development for Guest Quarters<br>2 Hotels. Prior to that I was project<br>3 director for the Fan Pier Project in<br>4 Boston. And that takes us back to about<br>5 1985.<br>6    From '80 to '85, I was receiver,<br>7 court appointed receiver for the Boston<br>8 Housing Authority. '78 to '80, I was<br>9 employed by Jirard and Brenner Kopp<br>10 (phonetic) doing real estate development.<br>11    THE DEPONENT: Do you need<br>12 to worry about spelling for Jirard and<br>13 Brenner Kopp?<br>14    THE REPORTER: I can get it<br>15 after you.<br>16    BY MR. McCORMICK:<br>17   Q. That's fine, Mr. Spence, I think<br>18 we've gone back far enough. I appreciate<br>19 it.<br>20    Were you appointed to your present<br>21 position as commissioner of DSS?<br>22   A. I was.<br>23   Q. By whom?<br>24   A. I was initially appointed by then- |



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:   617.557.0039
Toll Free:   866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                              July 21, 2006

---

9

1    Governor Jane Swift, and then reappointed
2    when Governor Romney was elected.
3       Q.   What are your duties and
4    responsibilities in your present position?
5       A.   As commissioner, I'm responsible
6    for the overall supervision of the child
7    welfare programs for the state of
8    Massachusetts. Basically I can describe
9    that in some more detail, but obviously
10   that's the summary.
11      Q.   In the normal course, if we can use
12   that term, or customary course of
13   business, are you involved in individual
14   cases?
15      A.   I become involved in individual
16   cases -- I'd say at any given time, I'm
17   probably involved in some way or another
18   in -- in one or more individual cases.
19      Excuse me.
20          (Cell phone interruption).
21          MR. McCORMICK: Excuse me.
22      BY MR. McCORMICK:
23      Q.   I'm sorry. You -- I was asking
24   you about your involvement in specific

---

11

1    and then there are cases that come to me
2    from external sources as well.
3       Q.   Could you give me an example of
4    what an external source would be?
5       A.   Anything from a legislative
6    inquiry, a legislator who is concerned
7    about a constituent, to the governor's
8    office, to obviously in child welfare, for
9    a child welfare commissioner, the
10   newspapers become a source of -- of cases
11   that become -- take the attention of the
12   commissioner, because the commissioner is
13   expected to respond publicly.
14      So those are the kinds of things.
15   It might be an e-mail or a letter from
16   someone directly, or a phone call.
17      Q.   You said that the commissioner is
18   expected to respond publicly. What do you
19   mean by that?
20      A.   The commissioner of the Department
21   of Social Services has the same
22   responsibilities that any public official
23   has of accountability to the public. So
24   the questions about -- questions about the

---

10

1    cases, and you had answered it.
2       A.   At any point in time, I'm generally
3    involved. The level of involvement varies
4    greatly, from -- it may simply be an
5    inquiry to ensure that a particular
6    circumstance is being appropriately handled
7    in accordance with the -- with the
8    practice standards of the department, or
9    it may be more extensive, depending.
10      Q.   In those specific instances where
11   you do get involved in a specific case,
12   Commissioner, is there a chain of command
13   or a procedure on how that case is brought
14   to your attention?
15      A.   Well, there certainly is a chain of
16   command, clearly. I mean, there are --
17   the organization is -- is a standard
18   hierarchical organization, and -- and so
19   there's a reporting process and the like.
20      But as commissioner, to some
21   extent, I'm also at the intersection of
22   both the internal and external relations
23   of the organization. So there are cases
24   that come to me through the organization,

---

12

1    performance of the department or questions
2    that the commissioner is expected to
3    respond to.
4       Q.   In all circumstances, or just some?
5       A.   I would say in all circumstances,
6    there may be -- that there then are --
7    are considerations that -- about how best
8    to respond and what constitutes appropriate
9    response.
10      But in -- in circumstances where
11   there are criticisms or challenges to the
12   department's performance, the public
13   accountability role of the media is
14   certainly a part of that. The media
15   generally looks to the commissioner for a
16   response. There will be determinations
17   about whether the commissioner responds or
18   whether I respond, that is -- I don't mean
19   to talk about myself in the third party --
20   whether I respond or whether the press --
21   chief press officer responds or whether
22   someone else responds, or whether no
23   response is appropriate, which could be
24   the case. But generally we're --

---



Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

13

1    Q. Who makes that determ -- I'm sorry.
2    A. Generally we're -- we're clearly
3  constantly held accountable.
4    Q. Who makes the determination as to
5  who would make a particular response to,
6  say, a criticism of DSS in a particular
7  case?
8    A. It will vary -- It varies with the
9  circumstances. So that for example, the
10  -- the public information officer may --
11  will often receive an inquiry, which may
12  or may not be directed to the
13  commissioner. She will sometimes make the
14  initial determination as to whether to
15  respond directly on be -- as a
16  departmental spokesperson, or whether
17  that's a matter that she ought to bring to
18  my attention, and ask me whether I choose
19  to, or assume, given the circumstances
20  that, you know, come to me and say, "Here
21  is one you're supposed to respond to." So
22  she certainly is a significant decision
23  maker in that process.
24     I'm a decision maker in that

14

1  process, and certainly other members of
2  the staff sometimes make those decisions
3  or are involved in those decisions. And
4  then there's always also the question of
5  the -- the general counsel's role in
6  advising on -- on the legal constraints on
7  a response.
8     Those are probably the major
9  players; the deputy for operations, the
10  general counsel, the chief -- the public
11  information officer, and myself. Those
12  are probably the major decision makers, in
13  most cases.
14    Q. Would it be fair to say that you
15  would have final say in that decision
16  making process?
17    A. Yes. I have -- As part of my
18  overall supervision responsibilities,
19  ultimately I have final say in this.
20    Q. You would be the decision maker in
21  that process?
22    A. Well, I have -- I certainly have a
23  review responsibility. So if someone
24  makes a decision that I think is

15

1  incorrect, it's my responsibility to --
2  through the chain of command, to address
3  that issue with that person. It doesn't
4  mean that in every instance I make the
5  decision, but I am responsible for the
6  decisions of the department.
7    Q. And you have the authority within
8  DSS to override someone else's decision?
9    A. Yes. Absolutely. I have authority
10  to direct the decision. Yes.
11    Q. I'm going to direct your attention
12  to 2000, the year 2004, you were the
13  commissioner of DSS at that time, correct?
14    A. I was.
15    Q. And do you recall a case involving
16  individuals by the name of James Chaplin
17  and Janice Brantley (phonetic)?
18    A. I have a general memory of a case
19  involving them, yeah.
20    Q. And what is your general memory,
21  Commissioner?
22    A. What's my memory of the case, of
23  what was occurring in the case?
24    Q. Yes.

16

1    A. My memory is that a -- in broad
2  brush, that a child was born or brought --
3  actually, I don't remember exactly --
4  either brought to -- no, I guess brought
5  to Massachusetts with the mother, who I
6  believe was named Brantley, that there was
7  a question about the father's custody of
8  that child, whether the father should be
9  granted custody of that child.
10     And that that -- that issue was
11  faced by the department as to what
12  position it would take on the question of
13  the appropriateness of the custody being
14  assigned to the -- the biological father.
15  I'm not sure that he was the -- actually
16  the father of record, but apparently
17  claimed to be the biological father.
18     I also remember that the mother was
19  a member of a recognized tribe in Alaska,
20  that there were some complicated additional
21  questions about custody based on issues
22  involving a very sensitive area of child
23  welfare law, which is the jurisdiction of
24  tribal child welfare law for members of



**ack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                                          July 21, 2006

---

**17**

1    the tribe. This is a topic that's a very
2    sensitive issue in national -- in child
3    welfare, that states can't usurp the
4    rights of tribes, which they have no legal
5    right to do, but often effectively do.
6         And so it's the issue of the
7    importance of state child welfare programs
8    clearly recognizing and deferring to tribal
9    child welfare jurisdictions, an important
10   one. And that was an important issue in
11   this case.
12        Q. If I told you that the department's
13   -- DSS's involvement began in this case in
14   early January of 2004, can you tell us,
15   approximately, when you first became
16   involved in this matter?
17        A. I'm -- I do not have strong memory
18   of the dates and chronology, so I honestly
19   couldn't tell you. If you told me, I'd
20   be -- I'd be -- you know, that might
21   refresh my memory. But I do not have a
22   clear memory of the --
23        Q. Do you have any memory -- Were you
24   involved in the decision to seek a -- to

**18**

1    seek a court order to get custody of the
2    infant to the department?
3         A. I don't believe so. No, I don't.
4    My -- My memory is I was not involved at
5    that stage.
6         Q. So it would be -- And would that
7    be consistent with your normal practices,
8    that you would become involved afterwards?
9         A. Well, it depends. Again, it
10   depends -- essentially depends -- in many
11   instances depends on the point at which
12   the controversy becomes public controversy,
13   and therefore becomes an issue that I am
14   accountable for responding or at least
15   addressing in some way.
16        If the care and protection petition
17   itself is highly controversial, then I
18   might become involved at the point in
19   which there's considerable public
20   discussion at that stage. Or if there are
21   private considerations, that is, if someone
22   raises a concern that concerns me about
23   the propriety of the department's actions.
24        But obviously thousands of care and

**19**

1    protection petitions are filed and
2    decisions made without my knowledge at
3    all. Thousands.
4         Q. If I can refer to this matter as
5    the -- if we can call it the Chaplin
6    baby, if we can use that, I think the
7    baby's name is Lyndon Yeagher Chaplin.
8    Can I show you this document and ask you
9    if you've seen it before?
10        A. I've -- I've seen this article
11   before. Obviously, not this particular
12   copy of it. But I have seen the
13   original.
14        Q. Thank you for the correction,
15   Commissioner.
16        I'm showing you an archived
17   Internet-generated copy of an article that
18   appeared in the Boston Globe on March 4th
19   of 2004.
20        Do you recall reading that article
21   on or about that time?
22        A. I remember that -- that I was --
23   Yeah, that I read this article, I think
24   actually, probably the day it came out.

**20**

1         Q. Prior to reading that article --
2         MR. WYZANSKI: Do you want
3    to mark it for identification?
4         (Exhibit-1, Article, marked
5    for identification).
6         BY MR. McCORMICK:
7         Q. Commissioner, with regard to the
8    Exhibit 1, which is a copy of a Boston
9    Globe column entitled "Bureaucracy and a
10   Baby," written by Adrian Walker, dated
11   March 4th, 2004, the part you say you saw
12   this -- you read this article in the
13   newspaper probably on the date it
14   appeared?
15        A. Very likely. Very likely so.
16        Q. Prior to that time, had you had any
17   involvement in this Chaplin-Brantley
18   matter?
19        A. It's obvious from the article, and
20   I do vaguely remember, that the author of
21   this column, Adrian Walker, spoke to me
22   about this case prior to writing the
23   column. So I clearly did become familiar
24   with the case.

---



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                                                    July 21, 2006

|  | 21 |  | 23 |
|---|---|---|---|
| 1 | Q. How did that occur? Did he call | 1 | and then you made the comments that you |
| 2 | you? Did Mr. Walker call you, or did you | 2 | did, or was it a situation where you, |
| 3 | call him? | 3 | because you already knew about the case, |
| 4 | A. I'm not a hundred percent sure. | 4 | or do you say, "I have to find out and |
| 5 | But in the vast majority of cases | 5 | get back to you"? |
| 6 | overwhelmingly the newspaper person calls | 6 | A. I don't remember with certainty |
| 7 | me. So I suspect that was the case here. | 7 | which. I mean, I do these probably, you |
| 8 | Q. Do you have any memory to the | 8 | know -- at least weekly I'm involved, and |
| 9 | contrary? | 9 | more often than that. So there are -- |
| 10 | A. I don't have any memory to the | 10 | there have been hundreds and hundreds of |
| 11 | contrary, no. | 11 | these phone calls that I've had to field |
| 12 | Q. Okay. Do you recall when that | 12 | over a period of five years. So I don't |
| 13 | conversation took place? | 13 | have a specific memory of how this |
| 14 | A. No. | 14 | occurred. |
| 15 | Q. But it would be before this | 15 | I have some rough memory, some |
| 16 | article? | 16 | vague memory of discussions with members |
| 17 | A. Shortly before the article, I | 17 | of my staff about the case. Whether that |
| 18 | presume. | 18 | was prompted by his phone call, and then |
| 19 | Q. Where were you when you received | 19 | we reengaged, or whether they'd already |
| 20 | the call? | 20 | come to me. He may very well have |
| 21 | A. I don't have a specific memory of | 21 | spoken, for example, to my press person, |
| 22 | the call. But I -- you know, my -- my -- | 22 | who may then have said, "Let me talk to |
| 23 | again, my reasonably certain surmise would | 23 | the Commissioner." |
| 24 | be that I was in my office. And I'd -- | 24 | And so again, how exactly it came |

|  | 22 |  | 24 |
|---|---|---|---|
| 1 | I'd be surprised if I were anywhere else, | 1 | to me, I don't remember. |
| 2 | because I think I would have remembered a | 2 | Q. Well, who did -- who in your staff |
| 3 | conversation out of the office with a | 3 | did you talk to about the Yeagher-Brantley |
| 4 | reporter, a columnist in this case. | 4 | matter? |
| 5 | Q. Before you got the call from Mr. | 5 | A. Well, I certainly would have talked |
| 6 | Walker about this Chaplin-Brantley matter, | 6 | to my public information officer. I think |
| 7 | had you had any involvement whatsoever in | 7 | I spoke to my chief of staff, Mia Alvarado |
| 8 | that case? | 8 | as a -- as the primary person |
| 9 | A. What, I don't remember, but, I | 9 | communicating the -- the department's |
| 10 | mean, clearly I must have had some | 10 | understanding of the case. I think. |
| 11 | knowledge of the case in order even to | 11 | Q. When you say that, do you mean she |
| 12 | make these comments to him. And certainly | 12 | would coordinate the information -- |
| 13 | if he's calling me about a case, I would | 13 | A. She'd coordinate the information. |
| 14 | have said to him -- if I hadn't known | 14 | That's usually the case. She often does |
| 15 | about it, I would have said to him, "Let | 15 | that. So I -- I am -- and I -- that -- |
| 16 | me get back to you." | 16 | that isn't inconsistent with the vague |
| 17 | Q. Well, that's my point. Do you | 17 | memories I have of this case. So it may |
| 18 | recall -- I don't mean to cut you off, | 18 | well be that that was the case. |
| 19 | Commissioner-- | 19 | Q. Do you have any memory of speaking |
| 20 | A. Yeah. | 20 | to any individual social worker or |
| 21 | Q. -- and interrupt you at all, but do | 21 | investigator -- |
| 22 | you recall what the scenario was here? | 22 | A. No. |
| 23 | Was it a situation where Mr. Walker called | 23 | Q. -- for the -- |
| 24 | you and asked you about this Chaplin case, | 24 | A. No. |



**Jack Daniel**

**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                            July 21, 2006

---

25

1    Q. -- DSS in this case?
2    A. That would be, I think, very
3    unlikely that I would have done that. I
4    don't think so.
5    Q. So is it safe to say that you got
6    your information about the Yeagher-Brantley
7    case from your chief of staff or the press
8    information person?
9    A. It's safe to say with -- you know,
10   some caveat that my memory on this is not
11   very precise. But, yeah. Yeah. That's
12   the likely -- again, I think the likely
13   course in which the communications
14   occurred.
15   Q. Did you read any documents or any
16   investigative reports or any medical
17   records that DSS may have secured during
18   its investigation in this matter prior to
19   speaking with Adrian Walker?
20   A. I don't have a memory of having
21   done so. I suspect not. I think
22   probably not. I don't a memory of having
23   done that. I think I probably got an
24   oral summary, or may have gotten a

---

26

1    summary, a -- sort of a written -- an
2    informal written summary. But I don't
3    think I went back to the original record.
4         My staff are able -- as am I,
5    officially, though I never do -- but my
6    staff are able to actually go into a case
7    record and obtain the entire case record
8    through the computer system. So they can
9    do that directly, or -- or they can talk
10   with members of the social work staff, who
11   have been working on a case, or lawyers.
12        So they can either do it by going
13   to the case record directly or by talking
14   to individuals about the case, or it's
15   usually some combination of those two.
16   Q. Do you have any specific memory of
17   you, yourself, seeing any of these
18   original documents, and by that I mean the
19   investigative reports or petitions for
20   custody?
21   A. I don't have any specific memory of
22   -- of having seen any primary sources, so
23   to speak.
24   Q. So would it be safe to say that

---

27

1    the basis of your information about the
2    Yeagher-Brantley (sic) matter was relayed
3    to you by, in all likelihood, your chief
4    of staff?
5    A. Most likely that was the way in
6    which I learned about it.
7    Q. And perhaps in just an oral
8    fashion?
9    A. Correct. So -- yeah. Yep. Yep.
10   Q. Now, with regard to Exhibit 1, when
11   you read Exhibit 1, what was your
12   reaction?
13   A. Well, I do remember that I was
14   struck, because -- and I'm in -- in the
15   third paragraph, it says, "Even senior DSS
16   officials now concede that they may have
17   acted in haste, though they do not say
18   what they plan to do about it," and I
19   presume that the senior DSS official was
20   me, since to the best of my knowledge,
21   Adrian Walker had not spoken to any other
22   senior DSS officials.
23        And I remember just being disturbed
24   that that in no way reflected our

---

28

1    conversation. I had not, at any point,
2    said that I thought that the department
3    had acted in haste. And so I remember
4    feeling -- certainly that -- that feeling
5    I remember clearly, because Adrian Walker
6    is somebody I know and have dealt with
7    over time, and I was surprised, because
8    I've always found him to be generally a
9    careful scribe of our conversations when
10   they've been in the press. So I -- I
11   remember feeling where -- how the hell did
12   Adrian get that wrong kind of feeling.
13   Q. Because in your dealings with Mr.
14   Walker, prior to March 4th, he usually got
15   things pretty right?
16   A. He generally got things pretty
17   right, so I was startled that that was so
18   clearly wrong.
19   Q. What else was your reaction?
20   A. Secondly, I think I -- I would have
21   felt that generally, first of all, that
22   this article did not -- I thought that
23   there were significant facts and
24   considerations in the case that were not

---



**J**ack Daniel
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

29

1    here in the article.
2        Q.  What were they?
3        A.  Most importantly, although I didn't
4    -- what I don't remember is, again, what
5    our conversation was, but -- and so
6    whether I had actually specifically talked
7    to him about it or not, most importantly
8    the set of questions about -- about tribal
9    jurisdiction, and the question of the
10   department's need to respond to the Alaska
11   tribal jurisdiction question.  And that
12   none of that was even -- the fact that
13   there was even any question about that was
14   nowhere reflected in the article.
15       Q.  And you had discussed that with Mr.
16   Walker?
17       A.  Well, that's what I don't remember.
18   I don't remember the specifics of our
19   conversation.  But I -- I may very well
20   have, since I was very aware of it.  I
21   might have discussed that with him.
22       Q.  Well, pardon me if I just clarify.
23   I think you just testified that one of the
24   reasons you had a reaction to this article

30

1    in Exhibit 1 is because there was no
2    information about the tribal aspects of
3    the custody battle, correct?
4        A.  Right.
5        Q.  And is it your testimony that
6    you're not sure that you discussed those
7    with Mr. Walker?
8        A.  My difficulty is that I don't
9    remember what I discussed with Mr. Walker.
10   I don't remember the details of our
11   conversation.
12       But I -- I certainly would have
13   felt, A, the public didn't understand what
14   was occurring in this case, given this,
15   and that my responsibility, either -- and
16   what I don't remember is either -- I
17   suspect that I had spoken with him about
18   it.  My problem is I can't reconstruct the
19   conversation.  I suspect I'd spoken with
20   him about it, and that there were those
21   issues.
22       Q.  Well, what was the department's
23   responsibility relative to this infant?
24           MR. WYZANSKI:  Objection.

31

1        A.  Yeah.  As characterized by whom?
2        Q.  The department.  The department
3    took action in this matter, the department
4    came into the Norwood Hospital, went into
5    court, got a court order taking custody of
6    this infant.
7        A.  Right.
8        Q.  Why did it do that?
9        A.  Oh, that I -- Well, first of all,
10   is that what you said?  I was not
11   involved in that.  But the department, I
12   believe, and the judge clearly concluded
13   -- the department recommends, and a judge
14   decides.  So --
15       Q.  I know the process, Commissioner.
16   I'm asking you what was the basis --
17       A.  Excuse me.  I was speaking.  You
18   don't need to interrupt me, please.
19       Q.  Commissioner, then fine.  Go ahead.
20   You speak all you want, and then I'll ask
21   the question, and you can answer the
22   question.
23       A.  I would appreciate that.
24           The department clearly thought that

32

1    there were was either abuse or neglect of
2    this child, apparently produced evidence
3    sufficient to a court, to convince a judge
4    that that was the case, and therefore the
5    department took custody of this child.
6        Q.  Have you finished?
7        A.  Yes.
8        Q.  Thank you.  What evidence did the
9    department have to go in to court that
10   there was abuse or neglect of this infant?
11       A.  As I earlier stated, I was not
12   involved in the care and protection
13   petition, so I don't know the details of
14   that.
15       Q.  You've, since that time when the
16   department first went in to court in this
17   matter -- and I say to you in early
18   January of 2004, you've certainly had
19   occasion to review this material, haven't
20   you?
21       A.  To review?
22       Q.  This file in this case?
23       A.  I'm sorry.  I'm confused.  You
24   asked me earlier whether I had read



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

|  | 33 |  | 35 |
|---|---|---|---|

**33**

1   documents involved in this case prior to
2   speaking to Mr. Walker.
3       Q.   And I'm stating to you -- my
4   question now -- let me clarify,
5   Commissioner.   At any time, and certainly
6   since the filing of this lawsuit, you've
7   had an opportunity to review any documents
8   you wish in this case, correct?
9       A.   If the question -- You have to help
10   me with what you mean you by, "I've had
11   the opportunity."   Do you mean I have the
12   authority, or do you mean that I've
13   actually reviewed them?
14       Q.   Have you had the opportunity to
15   look at these documents?
16       A.   I have the authority to look at
17   these documents if I choose to do so.
18       Q.   And you -- sometime in the last two
19   years, you've had the time to do that?
20       A.   Sometime in the last two years I
21   have not.   I have not reviewed these
22   documents.
23       Q.   Okay.   I'm not asking you if you
24   have reviewed the documents.   You've had

**35**

1        And if each time I were sued or
2   the agency I was -- I took -- had
3   oversight of was sued, I sat down and
4   pored over documents, I wouldn't have time
5   to do the important work of the
6   organization.
7       Q.   And what would that important work
8   be?
9       A.   That important work would be
10   guiding and directing the organization to
11   do the best job to serve children and
12   families in this state as possible.
13       Q.   And would that important work be
14   responding by writing letters to the
15   editor?   And I'll show you this document
16   and ask you if you've seen that before.
17       A.   (Deponent viewing document).
18          (Exhibit-2, Letter to
19   Editor, marked for identification).
20       A.   That important work would include
21   providing clarification or explanation,
22   appropriately ensuring that the
23   department's work is represented publicly,
24   so that the support and understanding of

**34**

1   -- No one has precluded you from looking
2   at any documents?
3       A.   I have the authority to do so.
4       Q.   And you chose not to?
5       A.   And I have chosen not to review the
6   documents.
7       Q.   Why is that?
8       A.   I guess the question would be, why
9   would I?
10       Q.   I asked you why you haven't read
11   any of these documents.   You're a
12   defendant in a lawsuit.   You know what the
13   case is, what the case is about, and
14   you've made the decision, according to
15   you, the conscious decision not to review
16   the documents in this case.   Why is that?
17          MR. WYZANSKI:   Objection.
18       A.   I have not reviewed the documents
19   in this case because I have a great deal
20   of confidence in the representation
21   provided to me by the Commonwealth of
22   Massachusetts, and because I've been sued
23   innumerable times as a public official.
24   Innumerable times.

**36**

1   child welfare work in Massachusetts is
2   advanced; therefore it would include, when
3   a columnist grossly misstates the
4   circumstances of a discussion, correcting
5   that record.
6       Q.   Okay.   So you're stating that the
7   columnist, in this case Mr. Walker,
8   grossly did what?
9       A.   You'd have to tell me what my words
10   were.
11       Q.   That was just a second ago, you
12   don't remember that?
13       A.   You don't, either.
14          MR. WYZANSKI:   Objection.
15          BY MR. McCORMICK:
16       Q.   Are we going to spar, Commissioner?
17   We could be here till midnight.   You were
18   45 minutes late.   We'll stay forever.
19          MR. WYZANSKI:   Objection.
20       A.   You started.
21       Q.   "Grossly misinterpreted" was your
22   words.
23          MR. WYZANSKI:   Grossly
24   misstated the record.



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

Lewis H. Spence                                                                July 21, 2006

---

37

1        MR. McCORMICK:  Thank you,
2    Counsel.
3        BY MR. McCORMICK:
4        Q.  Would you concur with that
5    interpretation from your counsel, that
6    those were your words?
7        A.  I don't remember.  We can check the
8    record.  That would be the best answer to
9    that question.
10       Q.  What was wrong with Mr. Walker's
11   article?
12       A.  Mr. Walker said, as I indicated to
13   you earlier, he said, "Even senior DSS
14   officials now concede that they may have
15   acted in haste, though they do not say
16   what they plan to do about it."  That was
17   not in fact what I said at all.
18       Q.  Okay.  Anything else in that
19   article that's in Exhibit 1 that is wrong
20   by Mr. Walker, Commissioner?
21       A.  That is wrong?  You mean incorrect?
22       Q.  In your opinion; incorrect,
23   inaccurate, not true, any of the above?
24       A.  (Deponent viewing document).  He

---

39

1    official he'd spoken to, and that was, in
2    my view, a -- that was, I believed, a
3    complete misrepresentation of my statements
4    on that matter.
5        It was suggested, in particular,
6    that I lacked confidence in the work that
7    the staff of the department had done.
8        And one of the concerns, when
9    you're a public official, is that if you
10   have a staff, as I have, of 3,500, in a
11   particular circumstance in which you
12   believe they are acting appropriately, to
13   have it represented publicly that you do
14   not believe they're acting appropriately;
15   undermines their confidence, their ability
16   to act with confidence, that if they take
17   the right action, that they'll be
18   supported by their boss, and instead
19   raises fears that their supervisor or the
20   person responsible for the agency will not
21   defend them when they take appropriate
22   action.
23       So I believed it was very important
24   for the morale of the organization and my

---

38

1    makes a number of statements about which I
2    don't have knowledge, that is, I don't
3    have any certain knowledge one way or
4    another.  So there's a number of things in
5    here that could be wrong.
6        Are there any that are, from my
7    view, based on my understanding of the
8    facts, incorrect?  No, not in terms of
9    facts stated, so far as I know.  But I
10   also know that there are circumstances in
11   fact that were available to us that would
12   contradict some of the conclusions.
13       Q.  Okay.  Now, is it fair to say,
14   Commissioner, that you take exception to
15   the language in Exhibit 1 in the third
16   paragraph to which you referred, "Even
17   senior DSS officials now concede that they
18   may have acted in haste, though they do
19   not say what they plan to do about it."
20       You take exception with that
21   comment made by Mr. Walker?
22       A.  I take exception in a sense that I
23   assume that I was the senior DSS official,
24   since I knew of no other senior DSS

---

40

1    relationship with the organization to
2    clarify and correct what was a gross
3    misunderstanding or misrepresentation of my
4    statements.
5        Q.  So would the answer to my question
6    be yes, you took exception to that
7    language?
8        MR. WYZANSKI:  Objection.
9        A.  The answer to that question is the
10   answer I gave.
11       Q.  There are other senior officials at
12   DSS besides yourself, are there not?
13       A.  Senior officials is presumably a
14   characterization that sort of is fairly
15   flexible, and different people that have
16   different views of what constitutes a
17   senior official.  But to the best of my
18   knowledge, there certainly are -- in my
19   view, there are other people, other senior
20   officials than myself.
21       Q.  So you would agree with me that
22   someone else may come to the same
23   conclusion as you, that someone else
24   besides yourself at DSS is a senior

---



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

41

1   official?
2   A.  Sure.  Absolutely.  Of course.
3   Q.  Did you check with anyone else to
4   see if they spoke to Mr. Walker, relative
5   to the statement of "senior DSS officials
6   now concede"?
7   A.  Certainly before I wrote the
8   letter, I -- I -- I am -- I'm confident I
9   would have done that.
10  Q.  Who did you check with?
11  A.  I don't remember, as I say.  But
12  I'm confident -- I know we had some
13  discussion about the letter, and I'm
14  confident that, A, had anyone who was a
15  senior official I would take that to mean,
16  for example, either myself or a deputy or
17  assistant commissioner or similar level;
18  that any one of those people would have
19  let me know if they'd spoken --
20  Q.  Did you speak --
21  A.  In fact, generally, it's safe to
22  say that within the department, anyone who
23  speaks to the press will let the press
24  officer know, and no one -- that no one

42

1   reported to her that they had spoken to
2   Mr. Walker.
3   Q.  Okay.  I think you mentioned a
4   minute ago, Commissioner, the senior --
5   when we were talking about who might be a
6   senior DSS official, what might those
7   titles be?  Deputy commissioner?
8   A.  Generally, you'd think of senior
9   officials as the commissioner, the deputy
10  commissioner, any of the several assistant
11  commissioners, general counsel, chief
12  financial officer.  Those are sort of the
13  -- what we call the senior staff, what's
14  called officially the senior staff.
15  Q.  What is -- So there is an official
16  title of senior staff at DSS?
17  A.  There is a -- Well, I don't know
18  if it's an official title.  There's --
19  There is a -- you know, on all our e-mail
20  forms there's what's called the senior
21  staff meeting, and everybody knows --
22  Q.  A senior staff description.  You
23  can use that term.
24  A.  Yeah.  There's a common

43

1   understanding within the organization.
2   It's a term regularly used.  We use it in
3   writing, who the senior staff is, and that
4   -- it refers to that group that I was
5   just describing.
6   Q.  Now, when you read Mr. Walker's
7   article, did you speak to each member of
8   the senior staff that you've just
9   described to see if they spoke with him?
10  A.  I don't remember.  No.  I'm sure I
11  didn't.  I'm sure I didn't.  As I say,
12  any member of the senior staff would
13  always inform me if they had talked to a
14  columnist, unless they were engaged in
15  some secreted communication, which I
16  suppose is within the realm of
17  possibility.  But I would be startled and
18  astounded and it certainly didn't fit with
19  my experience of -- of my work with any
20  of those people, nor has it ever been.
21  Q.  Or unless a senior staff member
22  thought they were speaking off the
23  record --
24  A.  As I say, something is secreted.

44

1   Q.  All right.
2   A.  Where they didn't want to
3   acknowledge that they had a conversation
4   or something.  But I -- as I say, that --
5   I've never had that experience in five
6   years.  That would astound me.
7   Q.  Could you go to page .2 of Exhibit
8   1, Commissioner, please.
9   A.  (Deponent complies.)
10  Q.  Paragraph 3 of the second full
11  paragraph where it states, "The abuse and
12  neglect order."
13  A.  Mm-hmm.
14  Q.  Have you had a chance to read that?
15  A.  Mm-hmm.
16  Q.  Did you become aware at any time
17  that the DSS had information that Mr.
18  Chaplin was a drug user?
19  A.  That Mr. Chaplin was a drug user?
20  Q.  Yes.
21  A.  I don't believe I -- I don't
22  remember having any information to that
23  effect prior to reading this article.  I
24  don't remember having that information.



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

45

1    Q.  Do you recall having any
2    information to the contrary that the
3    office of children's services in Alaska
4    had in fact not told DSS that Mr. Chaplin
5    was a drug user?
6    A.  I actually don't remember this
7    being a matter of controversy, so I have
8    no memory in either direction, either of
9    -- that the issue that was the issue of
10   public controversy was -- was about the
11   question of whether Mr. Chaplin should be
12   given custody of the child.
13        The drug abuse question was not --
14   certainly was not prominent in any
15   discussions I had with staff about that
16   issue.
17   Q.  What issues were prominent in this
18   particular case in the discussions you had
19   with your staff?
20   A.  The issues that were raised to me
21   by the staff as issues of serious concern
22   had to do with conversations that some
23   people -- whom, exactly I don't remember
24   -- but I believe initially people in the

47

1    Q.  Did you receive any telephone calls
2    from the governor's office relative to
3    this case?
4    A.  Again, I don't remember exactly.  I
5    believe the governor's Office of
6    Constituent Services referred it to us.
7    Whether they spoke to me or spoke to my
8    chief of staff, I don't remember.  But I
9    knew they certainly were in communication
10   with my office.
11   Q.  What about the governor's legal
12   counsel at the time, did you have any
13   discussions about this case with him?
14   A.  I don't think I ever spoke to the
15   governor's legal counsel about anything in
16   my time at DSS.  But I may be -- to the
17   best of my memory, I have no memory of
18   ever having any discussion with the
19   governor's legal counsel about any topic.
20   Q.  Did anybody in your staff tell you
21   that they had received a telephone call
22   from the governor's legal counsel about
23   the Yeagher-Brantley matter?
24   A.  Not that I remember.  But I

46

1    governor's office had had with two sets of
2    people.
3        One with Laurie Hurley (phonetic),
4    Mr. Chaplin's sister.  And two, with a --
5    what was characterized, apparently
6    self-characterized, I believe, though I'm
7    not, you know, certain -- as a very
8    wealthy couple in New Hampshire who
9    indicated in their conversations that they
10   were expecting to receive this child.
11   Q.  And how did you become aware of
12   that information?
13   A.  Again, this is where I'm -- I'm not
14   exactly sure.  I believe it would have
15   been through briefings from my staff,
16   likely my chief of staff.
17        But I remember very clearly the set
18   of concerns about calls to the governor's
19   office.  I believe initially -- and they
20   actually referred some of these calls to
21   the department.  But calls to the
22   governor's office from Laurie Hurley and
23   from a wealthy couple in New Hampshire who
24   were expecting to receive this child.

48

1    remember -- I certainly remember it was
2    the governor's office.
3        I -- I -- My memory was that it
4    was the Office of Constituent Services.
5    So if there were a call from the
6    governor's legal counsel, again, that
7    doesn't ring a bell, but that -- that's
8    not entirely inconsistent with it being a
9    governor's office concern.
10   Q.  Commissioner, I've also showed you
11   what's been marked now as Exhibit 2.
12   A.  Right.
13   Q.  What is that?  Commissioner, could
14   I have that one?
15   A.  Yeah.
16   Q.  No, you can use that one if you
17   want.
18   A.  Okay.
19   Q.  Just let me take this and keep them
20   together.
21   A.  This is a Xerox copy of a page of
22   -- I assume the Boston Globe.  It doesn't
23   actually identify it.  This doesn't have a
24   date or a -- or a thing, but I assume the


**J**ack **Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                        July 21, 2006

| | 49 | | 51 |
|---|---|---|---|

**49**

1   Boston Globe -- of the letters to the
2   editor page with a letter from me to the
3   editor of the Globe.
4   Q.  Did you write that letter that's
5   set forth in Exhibit 2?
6   A.  I believe I did, yes.
7   Q.  Is that letter, as it appears in
8   Exhibit 2, the letter, as you wrote it, to
9   the editor of the Boston Globe?
10  A.  Oh, I don't remember that.  They
11  not infrequently edit letters.  Whether it
12  was a little longer or a little -- that I
13  don't remember.
14  Q.  Would you have --
15  A.  It wouldn't have been substantially
16  different from this.
17  Q.  Would you have the original letter
18  that you wrote to the Globe?
19  A.  I have no idea whether my assistant
20  -- My assistant might have it in a file,
21  but I don't know.
22  Q.  Would these -- Would your
23  correspondence, such as this letter to the
24  editor, be done on a computer?

**50**

1   A.  Likely it may be on a -- on a --
2   on a drive, on a file, drive, yeah.  It
3   may well be somewhere in the recordkeeping
4   system of the department.
5   Q.  Commissioner, I think a couple
6   minutes ago you testified that you get
7   hundreds of these cases, hundreds of phone
8   calls and hundreds of matters to react to.
9       How many letters to the editor of
10  the Boston Globe have you written with
11  regards to a custody case?
12  A.  Since I've been commissioner?
13  Q.  Yeah.
14  A.  I may have written one or two
15  others.  But I don't remember
16  specifically.  I know I -- over the years
17  I've written letters to the editor, not
18  infrequently.
19      I don't remember whether I've
20  written -- I think I've -- I think I
21  remember one other that didn't get
22  published, and there may have been one or
23  two more.
24  Q.  Now, and again, just to clarify,

**51**

1   I'm talking in your capacity as the --
2   A.  No, I mean in my capacity as
3   commissioner.
4   Q.  -- commissioner?
5   A.  I think I remember one that didn't
6   get published, and I think I may have
7   written one or two more.
8   Q.  Why did you write this letter?
9   A.  I wrote this letter for the reasons
10  that the letter expresses, and that -- and
11  that I described earlier, which is, I was
12  very concerned that the staff, which I
13  believed had been acting thoughtfully,
14  carefully and judicially, would feel that
15  I had walked away from them or undermined
16  them when the topic became controversial.
17  And I have a very, very -- I've made a
18  very strong public statement to the staff
19  of the department.
20      In child welfare, there is a
21  frequent scapegoating of front line staff
22  by senior officials.  It's a classic.
23  That's a very strong piece of the history
24  of child welfare nationally.  And when a

**52**

1   case becomes a public controversy, the
2   senior official of the department, in
3   order to protect themselves, scapegoat
4   staff.
5       And I realized that a few years --
6   a few months into this job, and have made
7   public statements to the legislature,
8   written statements to the legislature, for
9   example, that I will not scapegoat staff,
10  that I will defend staff.  And -- And I
11  have actually paid dearly for that in
12  other cases, where I believed I was acting
13  correctly, and some of the media were
14  outraged.
15      But I believe this is critical,
16  because child welfare staff experience
17  themselves as being -- the way I describe
18  it is this way:  There's a crucial
19  parallel process in child welfare.  I'm a
20  social worker.  My task is to work with
21  children.  My experience of my
22  organization is that when the going gets
23  tough and the heat is up, authority -- I
24  am -- I am abandoned by authority and



**Jack Daniel**
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:       617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:     866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                                July 21, 2006

---

**53**

1    betrayed by authority. And then my task
2    as a social worker is to work with
3    children who have been betrayed by
4    authority. That's a very bad combination.
5        So it's been essential to the work
6    I'm doing and the organization never to
7    betray or walk away from the staff if
8    they've been acting appropriately. If
9    they act negligently, if they act without
10   due consideration, I will call them into
11   account for that, and tell the truth
12   publicly.
13       But it's crucial, and I've made
14   this a major issue with my organization,
15   that I will not walk away from them when
16   they're acting appropriately.
17       This column indicated that I was --
18   had walked away from them, and it was
19   crucially important that I make clear in
20   the record that -- that -- I -- that I
21   believed in this case, the staff were
22   acting appropriately and that I defend
23   those actions.
24       So it was part of a larger strategy

**54**

1    for my relationship as commissioner with
2    the organization.
3    Q.  This letter appears, if I tell you,
4    on March 29th of 2004, some 25 days after
5    Mr. Walker's letter. In that period of
6    time, what did you do to satisfy yourself
7    that the department had acted, in your
8    words, thoughtfully and deliberately for
9    the safety and well being of the child?
10   A.  Well, throughout this process, the
11   briefings I received from my staff
12   involved, obviously, a review and
13   examination of the department's work.
14       One of the questions was, had we
15   done right in this case? And -- and as I
16   said, there was some controversy about
17   what position to take in court. So this
18   was a difficult issue.
19       So I'd already -- there had already
20   been extensive review of this case by my
21   staff prior to their informing me what
22   they believed was the case with respect to
23   this case, and prior to my talking with
24   Mr. Walker.

**55**

1        I may have done additional review
2    or checking after that. I don't remember.
3       But I certainly would not have
4    written a letter to the editor. I mean,
5    again, if you're going to defend your
6    department, you need to be very sure that
7    your department deserves to be defended.
8       And there are circumstances where
9    I've done the opposite, where I've said
10   the department's actions were seriously
11   flawed. So I -- I am very careful about
12   these statements. So there was certainly
13   extensive review. I may have asked the
14   deputy for operations to review it more
15   extensively.
16       I am not a -- a social worker by
17   training. I didn't grow up in the child
18   welfare system. I'm a -- I am an
19   administrator and a public manager. And I
20   would rely often, very deeply do rely
21   greatly on my deputy for operations, who
22   is a lifelong social worker, of both
23   enormous talent and a great deal of
24   insight.

**56**

1        So I -- certainly I would have
2    likely discussed it with her during this
3    process at some point before writing the
4    letter.
5    Q.  And who is that deputy?
6    A.  Who is the deputy for operations?
7    Q.  Yes. At the time of this.
8    A.  It's still the same all the way
9    through. Susan Getlan (phonetic). Still
10   is.
11   Q.  You state in Exhibit 2, "I only
12   expressed uncertainty about what position
13   we at DSS would take in the upcoming court
14   case on custody, given the outstanding
15   uncertainties about both mother and
16   father."
17   A.  Mm-hmm.
18   Q.  Those are your words, Commissioner?
19   A.  Those are the written words in that
20   letter, yes.
21   Q.  And you wrote that?
22   A.  I believe I wrote that, yeah.
23   Q.  Well, it's over your signature.
24   A.  That's right. No. As I say, I

---



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:     866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                                    July 21, 2006

|  | 57 |
|---|---|

1  believe I wrote that.
2      Q.  What uncertainties about Mr.
3  Chaplin were you referring?
4      A.  Well, in my own mind -- in my own
5  mind, I was referring to -- I certainly --
6  certainly -- Well, I don't know what I was
7  referring to.
8      Let me say this:  In my own mind,
9  what most concerned me in this case with
10  respect to the father -- as opposed to the
11  jurisdictional questions involving the
12  Alaska tribal issue, which was a second
13  set of questions -- what most concerned me
14  was the concern about whether -- who was
15  this New Hampshire family?  Why -- And
16  they had said they'd been in communication
17  with Laurie Hurley, and they expected this
18  child to be theirs.  What was going on?
19  That was the key concern I had personally.
20      Now, there were other
21  jurisdictional considerations, that were
22  very strong, about the question of tribal
23  issues.  But those obviously are not
24  issues about the father, those are issues

|  | 59 |
|---|---|

1  before it can intervene.
2      In child welfare, we actually
3  intervene, and then go to court.  And the
4  child welfare process includes an initial
5  investigative process, then a longer 45-day
6  assessment process.  There's a recognition
7  that you may not know all the facts, but
8  that you still may choose -- that the
9  court will support the department in
10  holding a child because of suspicions or
11  uncertainties and concerns about the safety
12  of the child, before the department has
13  been able to definitively prove its case.
14      In this instance, the
15  considerations and concerns, without it
16  being definitively proven, but certainly
17  the concerns were, was there a
18  possibility, based on the phone calls from
19  New Hampshire, based on the conversations
20  that that family claimed they had with
21  Laurie Hurley, based on their seeming
22  representation -- their representation
23  seemingly that they expected this child to
24  become theirs, that there was in fact some

|  | 58 |
|---|---|

1  actually about the mother.
2      Q.  What information did you have when
3  you wrote this letter?  And is it safe to
4  say you wrote the letter sometime before
5  March 29th, when it appeared in the Globe?
6      A.  Sure.  I wrote it well before,
7  because usually it takes a couple of weeks
8  for a letter to appear.
9      Q.  What information did you have when
10  you wrote the letter that questioned, in
11  your mind, the fitness of the father,
12  James Chaplin, to be the custodial parent
13  of this infant?
14      A.  In my mind, personally, the
15  information I had was that there might be
16  -- this was not -- this was not -- and
17  let me go back a step.
18      Child welfare law is unusual in one
19  sense.  Because of the enormous primacy of
20  the issues of the welfare of the child,
21  there is a kind of preventive intervention
22  by the state into the lives of the family
23  that otherwise very rarely occurs.  By and
24  large, the state has to prove its case

|  | 60 |
|---|---|

1  form of illegal or inappropriate or -- or
2  nonlegal adoption going on.
3      And part of that question was,
4  therefore, could the father be trusted
5  with the custody of this child, or was
6  that simply going to facilitate the -- a
7  possible -- suspected, but not proven --
8  but a possible illegal adoption process.
9  That was a concern that I had personally.
10      Q.  Did you have any other concerns,
11  other than what you've just stated, about
12  the father's fitness?
13      A.  Oh, about the father's fitness.
14  Not to the best of my memory.  That was
15  -- Those were the things that I was very
16  aware of.
17      I think I actually had one
18  conversation with Laurie Hurley.  I don't
19  remember the content of that conversation.
20  But I do know that at the time that this
21  issue where the department was facing the
22  question of what posture to take, that I
23  shared a worry about whether this child
24  would be safe in the father's hands, based



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                        July 21, 2006

| 61 | | 63 | |
|---|---|---|---|
| 1 | on the possibility that there might be an | 1 | aware that the Alaska court, within days |
| 2 | illegal adoption being planned. | 2 | of your people arriving back in Alaska, |
| 3 | Q.  So when you used the term "safe in | 3 | awarded custody to James Chaplin of Lyndon |
| 4 | the father's hands," you mean that the | 4 | Yeagher Chaplin? |
| 5 | father might have put this child up for | 5 | MR. WYZANSKI:  Objection. |
| 6 | adoption illegally? | 6 | A.  I'm sorry.  To whom? |
| 7 | A.  Might actually in a sense be | 7 | Q.  The father.  That the baby, Lyndon |
| 8 | engaged in a -- in a baby selling scheme. | 8 | Yeagher, the custody of Lyndon Yeagher |
| 9 | Might be. | 9 | Chaplin was awarded to James Chaplin? |
| 10 | Q.  But you had no other concerns, | 10 | Have you become aware of that? |
| 11 | other than that, for the child's safety | 11 | A.  No.  I wasn't aware of that. |
| 12 | being with the father? | 12 | Q.  I want to show you this document, |
| 13 | A.  I have no other evidence that would | 13 | and ask you if you've seen it before. |
| 14 | raise other questions for me, that would | 14 | A.  No.  I've never seen this before. |
| 15 | certainly -- or if I did, they were | 15 | MR. McCORMICK:  Could we |
| 16 | certainly so minor that I don't remember | 16 | have this -- This is an affidavit of |
| 17 | it.  I very much remember this concern | 17 | Katherine Porter.  Could we have this |
| 18 | about -- about this New Hampshire couple. | 18 | marked as Exhibit 3, please. |
| 19 | I remember the conversations broadly, sort | 19 | (Exhibit-3, Affidavit of |
| 20 | of, with staff about this and so on. | 20 | Katherine Porter, marked for |
| 21 | Q.  Did anyone with your staff that you | 21 | identification.) |
| 22 | talked about this New Hampshire couple and | 22 | MR. McCORMICK:  Thank you. |
| 23 | this possible adoption, what was the basis | 23 | BY MR. McCORMICK: |
| 24 | of their information; did they tell you? | 24 | Q.  I'm going to show you this document |

| 62 | | 64 | |
|---|---|---|---|
| 1 | A.  It was the phone calls from the New | 1 | and ask you if you've seen that before. |
| 2 | Hampshire couple, who seemed to presume | 2 | A.  No.  I've never seen that before. |
| 3 | that they were going to get this baby. | 3 | MR. McCORMICK:  Could we |
| 4 | It was communications that they indicated | 4 | have this marked as Exhibit 4, the |
| 5 | that they had had with Laurie Hurley, and | 5 | affidavit of Margaret Cunnane Hall. |
| 6 | it was Laurie Hurley's obviously, sort of, | 6 | (Exhibit-4, Affidavit of |
| 7 | spokesperson role for her brother, which | 7 | Margaret Cunnane Hall, marked for |
| 8 | easily could lead to a surmise that there | 8 | identification.) |
| 9 | was a plan going on among the three of | 9 | BY MR. McCORMICK: |
| 10 | them. | 10 | Q.  Commissioner, the two Exhibits 3 |
| 11 | It was primarily the communications | 11 | and 4, are affidavits.  And your testimony |
| 12 | with the New Hampshire couple that raised | 12 | is that prior to today, you have not seen |
| 13 | the deep concern. | 13 | these, correct? |
| 14 | Q.  Did you later find out, | 14 | A.  I have no memory of seeing them |
| 15 | Commissioner, that the juvenile court in | 15 | before. |
| 16 | Massachusetts transferred this matter to | 16 | Q.  Exhibit 3 is dated the 28th of |
| 17 | state court in Alaska? | 17 | January 2004; Exhibit 4 is dated the 22nd |
| 18 | A.  I believe I did.  I do remember | 18 | of January 2004.  Obviously that's before |
| 19 | that. | 19 | you wrote your letter. |
| 20 | Q.  Did you ever become aware of the | 20 | A.  Right. |
| 21 | actions the Alaska court took in this | 21 | Q.  Did anyone in your department, |
| 22 | case? | 22 | during the briefings you had, inform you |
| 23 | A.  No. | 23 | of the existence of the affidavits |
| 24 | Q.  Are you aware -- Have you become | 24 | identified in Exhibits 3 and 4? |



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

| 65 | | 67 | |
|---|---|---|---|
| 1 | A. Not that I remember. No. | 1 | that this court process was occurring |
| 2 | Q. Did anyone tell you sum and | 2 | prior to -- I mean, you know, without, for |
| 3 | substance of the content of those | 3 | example, a home study and other kinds of |
| 4 | affidavits? | 4 | things like that, to make sure that -- or |
| 5 | A. Not to the best of my memory. | 5 | a -- or a determination of the fitness of |
| 6 | Q. Did anyone tell you that, "Hey, you | 6 | the father. |
| 7 | know, we were -- we had some suspicions | 7 | But fundamentally my consideration, |
| 8 | about this couple in New Hampshire, but | 8 | my personal considerations about his |
| 9 | it's not petering out. There's no concern | 9 | fitness, as opposed to the considerations |
| 10 | there." | 10 | about the jurisdiction of tribal -- |
| 11 | A. No. | 11 | Alaskan tribal child welfare law, my |
| 12 | Q. Did anybody tell you that? | 12 | considerations to that fitness were around |
| 13 | A. Nobody ever said that to me. No. | 13 | this question of the adoption. |
| 14 | Not that I remember. | 14 | Q. You'd agree with me, Commissioner, |
| 15 | Q. Prior to writing the letter to the | 15 | that in the normal course of events, DSS |
| 16 | Globe, did you become aware that Mr. | 16 | does not become involved in custody fights |
| 17 | Chaplin had moved for custody of the | 17 | between parents where one is a Native |
| 18 | infant? | 18 | American and one isn't? |
| 19 | A. I think that was the topic of the | 19 | A. Well, I'm not sure I know what that |
| 20 | -- of the entire controversy. So I | 20 | question means. |
| 21 | certainly knew that Mr. Chaplin was | 21 | Q. Yeah. It was a lousy question. |
| 22 | seeking custody of the infant. Yeah. | 22 | I'll rephrase it. |
| 23 | Q. Well, initially, Commissioner, you'd | 23 | A. Okay. |
| 24 | agree with me that Mr. Chaplin and Ms. | 24 | Q. You don't monitor the enforcement |

| 66 | | 68 | |
|---|---|---|---|
| 1 | Brantley, the mother and father, were not | 1 | of the Native Tribes Custody Act, if I can |
| 2 | married. | 2 | use that term. |
| 3 | A. That's my understanding. Yes. | 3 | A. I don't. But I do -- I do as a |
| 4 | Q. And initially the custody or the | 4 | -- again, as part of my role with the |
| 5 | petition was to take custody -- for DSS to | 5 | department, seek to emphasize to the |
| 6 | take custody from Janice Brantley? | 6 | department the importance of recognizing, |
| 7 | A. That's correct. Yes. | 7 | even in Massachusetts, the -- the import |
| 8 | Q. And then subsequently the father | 8 | of tribal child welfare law. There is one |
| 9 | contested custody. Mr. Chaplin wanted | 9 | tribe recognized in Massachusetts, who are |
| 10 | custody, correct? | 10 | located on Martha's Vineyard. |
| 11 | A. That's right. | 11 | I went out of my way to make a |
| 12 | Q. And other than the information that | 12 | personal trip to visit. Actually, I did |
| 13 | you've testified to a minute ago about | 13 | not make the trip to Martha's Vineyard. I |
| 14 | these people in New Hampshire seeking to | 14 | was there. |
| 15 | adopt a child, did you, at any time, have | 15 | But I visited the tribal |
| 16 | any concerns about the fitness of Mr. | 16 | headquarters, because I wanted to emphasize |
| 17 | Chaplin as a parental -- as a custodial | 17 | to the department that this is a coequal |
| 18 | parent of Lyndon Yeagher Chaplin? | 18 | organization, coequal child welfare |
| 19 | A. To the best -- I -- I had no | 19 | jurisdiction; in part, A, because we do |
| 20 | evidence, other than the evidence I've | 20 | have and most of -- many of my workers |
| 21 | discussed with you, that there was a -- | 21 | that -- don't even ever think of Indians |
| 22 | that there were -- that there would -- | 22 | in Massachusetts, so it never occurs to |
| 23 | that would challenge the fitness. | 23 | them that there are these issues; and |
| 24 | I also knew that, as I always know, | 24 | secondly, there is a strong movement for a |



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                                        July 21, 2006

### 69

1    second tribal recognition in Massachusetts,
2    which would involve a very larger -- a
3    much larger number of children and
4    families, particularly in the southeast.
5        And I have believed that it's
6    important to child welfare workers in
7    Massachusetts that tribal welfare -- child
8    welfare law is not just a matter of
9    consideration, of concern to South Dakota
10   and Oklahoma, but also in Massachusetts.
11   So it is a matter I try and emphasize.
12       Q.   My point is, Commissioner -- and
13   I'm not phrasing is too well -- but the
14   mandate of DSS is to protect neglected and
15   abused children, correct?
16       A.   Right.
17       Q.   And it is not normally just getting
18   involved in tribal issues of custody where
19   there is no neglect or abuse alleged?
20       A.   Oh, no -- no child welfare
21   organization consciously gets involved in
22   any circumstances, tribal or otherwise, in
23   which there's no abuse or neglect
24   involved.   That is the -- that's the

### 71

1    attain the goal you've stated, why didn't
2    you use a more general type of letter?
3    Why did you have to refer to this specific
4    case?
5        A.   Well, a letter to the editor is
6    usually a response to a particular
7    article.   In this case, it was in response
8    to a very particular column.
9        You also know that that letter --
10   if it followed the day after, if they
11   published letters the day after the column
12   appeared -- if you were able to get them
13   in, get them written, get them to the
14   paper, and get them published all within
15   24 hours, the reader would know what you
16   were responding to.   But if -- if -- if
17   not, I mean, since that's not the case,
18   you always have to, sort of, find a way
19   of saying "I'm responding to
20   blankety-blank, the column about such and
21   such."
22       So I put the name in simply because
23   the name was the -- was in the first line
24   of Adrian Walker's column, and it was a

### 70

1    statutory charge we have.   That's what
2    gets us involved.
3        Q.   If there hadn't been any questions
4    on behalf of DSS as to neglect or abuse
5    of Lyndon Yeagher Chaplin, the fact that
6    his mother was a Native American would not
7    have brought DSS -- any involvement by
8    DSS?
9        A.   That's right.
10       Q.   In writing your letter, I think
11   you've testified in pretty good detail
12   this afternoon as to why you wrote the
13   letter, and if I might paraphrase that --
14   and if you disagree, please let me know --
15   it was to make sure that the front line
16   people at DSS didn't think that the
17   higher-ups or the senior officials were
18   throwing them under the bus?
19       A.   That's the fair way of -- a summary
20   way of describing it.   That's right.
21       Q.   Why did you have to mention the
22   specific case and the specific name of the
23   infant, Lyndon Yeagher Chaplin, why,
24   Commissioner, in your efforts to do -- to

### 72

1    way of identifying the column I was
2    responding to.
3        Q.   And in writing the letter -- and
4    again, if I'm repetitive, Commissioner, I
5    don't mean to be.   In writing the letter
6    that you did on Exhibit 2, you had, if
7    not reviewed -- I think your testimony is
8    you don't recall whether you reviewed any
9    specific documents --
10       A.   I don't believe I reviewed any
11   specific documents, but I had asked for a
12   careful review by the staff and gotten a
13   summary.
14       Q.   And that staff gave you that
15   information?
16       A.   What I believed was a careful
17   review from them.
18       Q.   And that's upon what you based your
19   letter on?
20       A.   Yeah.   That's right.
21       Q.   And that information, that is, the
22   information that you got from the staff
23   about their involvement in this case, led
24   you to write the letter?



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use  •  Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

73

1    A.  I believe that's the case.  That's
2  my memory.  That's right.
3    Let me add -- Let me add one thing
4  to that, if I can.  When I say, "the
5  staff," the information I get is generally
6  based on a review of the work by line
7  staff in a case, by senior supervisors, my
8  people in a senior role in the
9  organization.  So that it isn't simply an
10  account of what the people directly
11  involved in the case say, but it's also
12  got a -- an evaluative lens by the
13  supervisory folks that the work that they
14  have been doing -- that would either
15  confirm or -- or otherwise, they had been
16  given by the staff, and that includes some
17  evaluation of the quality of that work.
18    So I want to be clear it isn't
19  just a, you know, I'm the social worker,
20  here's what happened, boss, and then I
21  just say okay automatically.  There's an
22  evaluation in that process, and that
23  evaluation is a crucial part of it, that
24  that work is in fact been careful and

74

1  appropriate, is in accordance with good
2  child welfare practice, or at least -- at
3  least meets -- at a minimum meets minimum
4  standards for child welfare practice,
5  hopefully is good child welfare practice.
6    Q.  And you had convinced yourself at
7  the time you wrote the letter that the
8  appropriate level of work had been done in
9  this case by DSS?
10    A.  Well, I -- I'd rather not phrase it
11  as my having convinced myself.
12    Q.  Well, you were satisfied enough
13  that you wrote the letter?
14    A.  I -- I was satisfied that the
15  department was acting in good faith on the
16  -- the best information available to it at
17  the time, given its protective
18  responsibilities and given the fact that
19  we are often having to act without as much
20  fact as we wish, which is very often the
21  case.
22    We are -- That's what I meant about
23  what I said earlier, that we do, sort of,
24  preventive intervention.  We are often

75

1  acting in circumstances where we're working
2  on our best guess.  And then over time,
3  usually -- here in this case, there was
4  this whole issue of going back to Alaska.
5    All out-of-state cases have time
6  pressures to them that are much greater,
7  usually, than in-state cases, because
8  usually somebody is about to leave, and
9  you've got to do something, make a
10  decision quick.  And at that -- and you
11  don't have the opportunity for full, you
12  know, investigations, lengthy involvement,
13  lots of court hearings in which the facts
14  gradually get developed, and then final
15  decisions.
16    So the department in this instance,
17  I felt, was acting in good faith with a
18  conscientious concern for the safety and
19  welfare of the child, with whatever
20  information was currently then available to
21  it, which is the best it can do, and that
22  I wanted to make clear, that I was not
23  impeaching the quality of that work.
24    Q.  Okay.  Now, again, the department

76

1  initially took the -- filed a petition for
2  the custody of the infant, Lyndon Yeagher
3  Chaplin, in early January of 2004.  We're
4  now talking about letters that appeared in
5  the Boston Globe in your response thereto
6  that appeared in March of 2004.
7    A.  Right.
8    Q.  Again, I know you testified that
9  you had no information about Exhibits 3
10  and 4, the affidavits relative to the
11  people in New Hampshire and their
12  adoption.  What effect -- Strike that.
13    If you had known of the existence
14  of the affidavits mentioned in Exhibits 3
15  and 4 in March, early March of 2004, would
16  that have changed your opinion that the
17  Department of Social Services was acting
18  appropriately in seeking to take custody
19  from Mr. Chaplin?
20    MR. WYZANSKI:  Objection.
21    A.  Well, first of all, I don't believe
22  the department ever took custody or sought
23  to take custody from Mr. Chaplin, because
24  I don't believe -- unless I'm wrong -- Mr.



Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                            July 21, 2006

77

1    Chaplin ever had custody. I believe the
2    mother had custody. And we took custody.
3    And then the question was, should we
4    surrender custody to the father?
5        So unless I misunderstand the law,
6    because in addition, he was not, I
7    believe, as we've agreed, married to the
8    mother, so I don't know what the status of
9    his legal claims of his parental rights
10   were.
11       But the question came to me at a
12   point of which we already had custody, and
13   the question was do we surrender it to the
14   father?
15       So I -- I should clarify, the
16   article says, and I remembered that, that
17   these persons had sworn. I've never seen
18   those documents. I had not heard from my
19   staff that there were denials -- that
20   there were legal documents denying. So
21   this would have been the first I would
22   have known of it. Would that have altered
23   my --
24       Q.  Let me rephrase the question with

78

1    your clarification, Commissioner.
2        A.  Okay.
3        Q.  The department had a decision to
4    make in, say, the February-March 2004 time
5    frame, whether it was going to surrender
6    the custody it had been temporarily
7    awarded by the court in January of '04, to
8    the father, James Chaplin?
9        A.  Right.
10       Q.  It chose not do so, correct?
11       A.  It chose to argue to the court that
12   -- that the father should not be awarded
13   custody. That's correct.
14       Q.  What was the basis of that position
15   by the Department of Social Services? And
16   if it's the same basis as the concerns
17   about this adoption in New Hampshire.
18       But other than what you've
19   testified to, Commissioner -- I don't want
20   to put words in your mouth, but I don't
21   want to repeat everything, either.
22       A.  Right. Right.
23       Q.  Were there any other concerns,
24   other than the New Hampshire adoption

79

1    question, that formed the basis of DSS's
2    position in court that the custody of the
3    infant not be awarded to James Chaplin?
4        A.  Yes. There was a second
5    consideration.
6        Q.  What was that?
7        A.  And that was the fact that the
8    mother of the child was a member of a
9    tribe in Alaska, and that that tribe was
10   in touch with the department, and was
11   asserting jurisdiction over those
12   decisions.
13       Q.  How did that affect it? Why would
14   DSS be involved in an assertion by a third
15   party such as the tribe?
16       A.  Because under Indian child welfare
17   law, that they have jurisdiction over this
18   child, and we needed to respect that
19   jurisdiction.
20       Q.  Were you aware of any ruling that
21   awarded jurisdiction to the tribe over the
22   custody of this child?
23       A.  I know that when a child is -- is
24   a member of a tribe, that that tribal

80

1    welfare -- tribal child welfare law has
2    primacy over state law, with respect to
3    child welfare determinations about that
4    child, and that the state system must step
5    back and acknowledge that and recognize
6    and surrender any of its claims to the
7    tribal child welfare law, in at least the
8    great majority of cases.
9        There may be circumstances I don't
10   know, because we don't -- we're not
11   Oklahoma or South Dakota, so we don't deal
12   constantly in this issue.
13       But I know that the question of
14   deference to child welfare law for a child
15   over whom a tribal child welfare
16   organization has jurisdiction, is a very
17   important issue in the law. I mean, there
18   are endless federal conferences where this
19   is a major issue, where everybody is angry
20   at states who don't take into
21   consideration the fact that this child,
22   being an Indian, that is a formal member
23   of a tribe, that the state acts, rather
24   than deferring to the tribe. I know that



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

Lewis H. Spence                                                July 21, 2006

| 81 | |
|---|---|

1    very deeply.
2      Q.  Would you agree with me,
3    Commissioner, that under the mandate and
4    the obligations of DSS in the Commonwealth
5    of Massachusetts, asserting the rights of
6    a Native American tribe is not even
7    mentioned and is not within your purview?
8      A.  It's not -- I'm sorry.  Is not --
9      Q.  It's not mentioned in your mandate,
10   is it?
11     A.  This is a matter of federal law, as
12   well as state law.
13     Q.  I'm not asking about the law.  We
14   have the -- courts were deciding that.
15     A.  Right.
16     Q.  And in fact, in this particular
17   case, Commissioner, the Indian tribe in
18   question -- and I apologize for forgetting
19   the name of the tribe -- but the Native
20   American tribe petitioned the court in
21   this case for custody.  Is that your
22   memory?
23     A.  I don't -- I don't remember
24   actually.  But I remember that they

| 82 | |
|---|---|

1    generally were seeking at least
2    jurisdiction; that we felt at least it was
3    at a minimum their decision, not ours.
4      Q.  Their decision for what?
5      A.  To decide where custody of this
6    child should go.
7         Mr. Chaplin is not Native American.
8    The child is, and the child's mother is.
9    So the question of whether or not the
10   child should be -- should be -- custody of
11   the child should go to a nonNative
12   American is not something we believe that
13   the state of Massachusetts should decide,
14   but rather something that the appropriate
15   jurisdiction should decide, which was
16   tribal law.
17     Q.  And did that form part of the
18   basis --
19     A.  Absolutely.
20     Q.  -- in the department's decision not
21   to -- Strike that.
22        Did that form -- what you just
23   stated, the standing of the Native
24   American tribe, if I can characterize it

| 83 | |
|---|---|

1    that, or the claim --
2      A.  Yes.
3      Q.  -- of the Native American tribe,
4    did that form part of the basis in which
5    -- of the department's decision to contest
6    the custody of Lyndon Yeagher Chaplin to
7    James Chaplin?
8      A.  Yes, it did.
9         MR. McCORMICK:  It's been an
10   hour and a half, so.  Why don't we take
11   five minutes, take a break.
12        MR. WYZANSKI:  And how long
13   do you think beyond that?
14        MR. McCORMICK:  I don't want
15   to spend any more time here less -- more
16   than you do.
17        MR. WYZANSKI:  Which tells
18   me what?
19        MR. McCORMICK:  I don't
20   know.
21        (Brief break).
22        BY MR. McCORMICK:
23     Q.  Let me show you this document and
24   ask you if you've seen that before.

| 84 | |
|---|---|

1      A.  I think I do remember this.  And
2    that's your signature or --
3      Q.  Do you remember seeing a letter
4    like that, probably signed by me?
5      A.  Yeah.  Yeah, I think so.
6         MR. McCORMICK:  Can we have
7    this marked as Exhibit 5, please.
8         (Exhibit-5, Letter from Mr.
9    McCormick, marked for identification).
10        BY MR. McCORMICK:
11     Q.  Can we go back to Exhibit 2 for a
12   moment.
13     A.  (Deponent viewing document).
14     Q.  Second to last paragraph, "Walker
15   made a classic child welfare error.  He
16   became overly invested in his beliefs
17   about the father, and then refused to take
18   in new data that should have prompted a
19   reconsideration of those beliefs."  What
20   new data are you referring?
21     A.  Well, I'm assuming, one, and I
22   don't -- again, this is where I don't
23   remember my conversation with him -- but
24   at a minimum, the jurisdictional question



**Jack Daniel**
**Court Reporting & Video Services**
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

85

1    about the Indian child welfare issues.
2    Q. Anything else? Any other new data
3    that you believe Mr. Walker should have
4    taken?
5    A. Not that I -- you know, I couldn't
6    -- I couldn't identify specifically
7    anything else.
8    So I think the -- you know, he was
9    writing a column vindicating the father's
10   rights without recognizing that there were
11   a whole set of other rights that needed to
12   be vindicated, and that I -- I may very
13   well have discussed that jurisdictional
14   question with him.
15   Q. The rights that you were talking
16   about, the other rights that needed to be
17   vindicated to which you just referred, are
18   those the rights of the Indian tribe?
19   A. Well, they're the rights of the
20   Indian tribe, but they're for the rights
21   of the child, to whom shares this decision.
22   Q. The child had at no time been
23   determined as a member of the tribe during
24   the course of this litigation, had it?

86

1    A. I don't know. Not -- Not that I
2    know of. But neither did I know -- I
3    didn't believe -- I didn't have any
4    understanding that anyone disputed the
5    jurisdiction of the tribe.
6    Q. Did you ever find out what the
7    tribe -- the outcome of the tribe's claim
8    to jurisdiction in Alaska was?
9    A. No.
10   Q. If I told you that the tribe was
11   not awarded jurisdiction of Lyndon Yeagher
12   Chaplin, would that surprise you?
13   A. Probably. Yeah.
14   Q. Why is that?
15   A. Because everyone seemed to presume
16   that they had jurisdiction, and that she
17   was -- I'm sorry -- that the tribe --
18   what do you mean -- didn't even have the
19   right to make the decision?
20   Q. No. That the tribe was not awarded
21   jurisdiction.
22   MR. WYZANSKI: Jurisdiction
23   or --
24   A. Jurisdiction or custody?

87

1    Q. Jurisdiction to hear custody. This
2    would be in a tribal court, correct?
3    A. Well, that -- I -- I don't know
4    child -- Indian child welfare law well
5    enough to know how they'd make that
6    decision. So the document you showed me
7    earlier or -- excuse me -- the information
8    you told me earlier about custody having
9    been granted to the father was not by the
10   tribe, but by an Alaska state court.
11   Q. By the Alaska state court, yes.
12   A. Okay. No, I didn't. I -- I would
13   be surprised because my understanding was
14   the tribe had deserted jurisdiction, my
15   understanding was nobody was disputing
16   that, and the only question was, you know,
17   should we honor it or not. So that would
18   surprise me. That would -- That would --
19   That would surprise me.
20   Q. I want to show you these documents.
21   Have you seen those before?
22   A. I have seen this document before.
23   Q. Are these your answers to
24   interrogatories propounded by the plaintiff

88

1    in this case?
2    A. Yeah. I believe they are. Yes.
3    Q. And is that your signature that
4    appears on page .6?
5    A. I believe it is.
6    MR. McCORMICK: Can we have
7    that marked as the next, Exhibit 6,
8    please.
9    (Exhibit-6, Answers to
10   Interrogatories, marked for
11   identification).
12   BY MR. McCORMICK:
13   Q. Mr. Spence, the -- I think you've
14   testified earlier, if you haven't, would
15   you agree with me that the Department of
16   Social Services in Massachusetts comes
17   under media attention quite frequently?
18   A. That's right.
19   Q. And at times, it comes under
20   critical media attention?
21   A. Right.
22   Q. Or if I can rephrase that, the
23   media criticizes --
24   A. Right.



Jack Daniel
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:     866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

89

1    Q. -- the action or inaction by the
2    Department of Social Services?
3    A. Right.
4    Q. You don't write a letter to the
5    editor on each and every one of those
6    instances, do you?
7    A. No, I don't.
8    Q. And there's nothing that -- in the
9    law that requires you to respond to media
10   attention, is there?
11   A. There's nothing that requires me to
12   respond to media attention. But I do have
13   a clear statutory charge to -- I don't
14   know the exact language of the law -- but
15   to oversee the department. And one of
16   those things, therefore, to improve the
17   department's work and make it the best
18   child welfare department I can make it.
19   And that, from my view, sometimes requires
20   -- that general charge sometimes requires
21   that I respond to media attention.
22   Q. But that's a decision that you
23   make?
24   A. That's a decision that I make.

90

1    That's an interpretive decision.
2    Q. Nothing required you --
3    A. Nothing required me.
4    Q. -- to write this letter that's been
5    marked in Exhibit 2?
6    A. That was a pure matter of a
7    decision made by me and after discussions
8    with my staff about how -- how to deal
9    with the impact of the Adrian Walker
10   column on -- on the staff of the
11   department.
12   Q. When you were talking about your
13   staff -- Strike that.
14       Did you discuss how to respond to
15   the Adrian Walker column with your staff
16   at all?
17   A. I honestly, again, don't remember.
18   I'm sure I did. I generally do. So I
19   suspect I did.
20   Q. Did anyone tell you, "Hey, this
21   matter is in juvenile court," or "This
22   matter is under a DSS investigation, we
23   shouldn't disclose any information"?
24   A. Well --

91

1    Q. Words to that effect?
2    A. -- obviously if that had been the
3    case, I wouldn't have responded to Mr.
4    Walker in the first place.
5    Q. So the answer would be no?
6    A. So the question about the
7    circumstances in which child welfare
8    organizations respond to -- to media
9    inquiries is a -- is a hugely important
10   and contested issue in child welfare.
11       The general rule that is followed
12   by most child welfare organizations is
13   that to -- is that you respond to correct,
14   clarify once something is in the public
15   record, and that when a participant in a
16   child welfare case makes a decision to
17   disclose information about a child and/or
18   a family, that to the extent that there's
19   a -- that we -- our general working rule
20   is that to the extent that we need to
21   respond to correct, clarify or clarify, we
22   do so. But we try to not add any facts
23   to the record, any new facts to the
24   record.

92

1    Q. What record are you referring?
2    A. To the public record.
3    Q. The public record --
4    A. Not to introduce new facts that
5    aren't already in the media, already in
6    discussion in print, or -- or -- or are
7    about to be printed by members of the
8    media.
9    Q. Yet you make reference, would you
10   agree with me, in your letter to the
11   editor, when you state, "He became overly
12   invested" -- "over invested in his beliefs
13   about the father, and then refused to take
14   in new data that should have prompted
15   reconsideration of those beliefs," you were
16   referencing certain material that was not
17   in Mr. Walker's column, but that was in
18   the possession of DSS?
19   A. Yes. I referenced -- Well, it had
20   to do with the legal jurisdiction
21   question, which was actually in the
22   courts.
23   Q. You didn't say that in your
24   letter --



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

93

1   A. When you asked me what --
2   Q. No. In your letter. Please listen
3   to me.
4   A. No, no, because I didn't write -- I
5   didn't -- I purposely did not specify what
6   the data was, because that -- that would
7   raise a whole series of other questions.
8   I didn't want to add additional
9   controversy, so I simply said there was
10  other data.
11  Q. And that other data was data that
12  was in the DSS files, not referenced by
13  Mr. Walker's column, correct?
14       MR. WYZANSKI: Objection.
15  A. Well, that data was data about the
16  legal jurisdiction question. I suppose
17  there was discussion of that in files. It
18  was in the knowledge of DSS, or at least
19  in the belief and knowledge of DSS, that
20  there was a jurisdictional question.
21       I -- I -- precisely because -- it's
22  precisely out of concern for not adding
23  any facts, but simply seeking to clarify,
24  without going beyond what's necessary to

95

1   new data that should have prompted a
2   reconsideration of those beliefs," that a
3   reasonable inference would be that there
4   was something about that father that would
5   lead him to be unfit as a custodial
6   parent?
7   A. I don't -- I mean, that -- you
8   know, what inference one takes from that
9   is -- is -- is open to all sorts of
10  interpretations.
11  Q. I'm not asking you what inference
12  to take. I'm asking: You would agree
13  with me that that might be a reasonable
14  inference from a reasonable reader to
15  those words?
16  A. I think a reader might -- might
17  surmise any number of things from this.
18  Q. Would that be one of them?
19  A. One reader might surmise that there
20  was something about the father. One
21  reader might surmise something else.
22  Q. Well, you were specifically
23  referring to the father in that paragraph,
24  correct?

94

1   clarify, that I did not specify what that
2   was. I was careful not to specify any
3   new data. But I did want to -- but I
4   referenced it. So I did not add any
5   facts to the record.
6   Q. And again, the record -- when you
7   used the term "record," you mean Mr.
8   Walker's column?
9   A. In this case, the record would be
10  Mr. Walker's column. I don't believe
11  any --
12  Q. Not the court record, not the
13  documents in the file.
14  A. No, I mean the -- I mean, the
15  public record, the media record, the
16  public record, what is in the public
17  domain. I don't believe my letter added
18  new facts to what was in the public
19  domain.
20  Q. Would you agree with me,
21  Commissioner, that when you stated, "Walker
22  made a classic child welfare error. He
23  became over invested in his beliefs about
24  the father, and then refused to take in

96

1   A. Well, actually father and mother.
2   Q. Well, it doesn't say that, does
3   that, it says, "Walker made a classic" --
4   A. Well, and that's --
5   Q. Please let me finish my question.
6   I'm trying to let you finish your answer.
7   A. Fair enough.
8   Q. "Walker made a classic child
9   welfare error, he became over invested in
10  his beliefs about the father."
11  A. Right. You're correct.
12  Q. Thank you. Did you realize, when
13  you wrote this letter, that this matter
14  was in juvenile court?
15  A. Yes.
16  Q. Did you have any discussions with
17  the office of child services or your
18  similar counterpart in Alaska about this
19  case?
20  A. Did I personally?
21  Q. Yes.
22  A. No.
23  Q. Were you aware that anyone for the
24  Department of Social Services had such a


**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

| 97 | 99 |
|---|---|
| 1  conversation with its counterpart in | 1  safety concerns, and we certainly would |
| 2  Alaska? | 2  have wanted to investigate further. |
| 3    A.  I don't know. | 3    Q.  But in this particular case, again, |
| 4    Q.  Were you ever informed of what the | 4  that was not a concern? |
| 5  position of the state of Alaska's office | 5    A.  It did not -- I did not remember |
| 6  of child services was relative to the | 6  it as being a salient issue in my |
| 7  custody of Lyndon Yeagher Chaplin? | 7  discussions.  Whether at lower levels |
| 8    A.  I think the only thing I learned of | 8  staff had examined that question, I don't |
| 9  -- I learned from the column, if it was | 9  know.  It was not salient in my -- in my |
| 10  correct, that it's the issue about the -- | 10  concerns.  You know, my belief that the |
| 11  the Alaska official claiming he filed a | 11  department was acting appropriately was not |
| 12  formal affidavit about Chaplin.  And that | 12  a belief based on an assumption about his |
| 13  issue I learned from the -- those issues I | 13  drug use or lack of drug use. |
| 14  learned in the column. | 14    Q.  Did you have any contact at all |
| 15    Q.  And that column also references | 15  with any member of the court in this |
| 16  that that Alaskan official said he never | 16  particular case? |
| 17  did that? | 17    A.  No. |
| 18    A.  Yeah.  Never did that.  Right. | 18    Q.  Were you aware that the judge, |
| 19    Q.  But is it your testimony, | 19  during the course of these proceedings was |
| 20  Commissioner, that before reading Mr. | 20  making telephone calls to the office of |
| 21  Walker's column of March 4th, 2004, that | 21  children services in the state of Alaska? |
| 22  you weren't aware of either one of those | 22    A.  No. |
| 23  scenarios, that an Alaska official had | 23    Q.  In your article -- strike that. |
| 24  said something about Mr. Chaplin, and then | 24      In your letter -- |

| 98 | 100 |
|---|---|
| 1  said, "I didn't say it"? | 1    A.  Yeah.  Yeah. |
| 2    A.  Well, I don't -- I don't remember | 2    Q.  -- you state, "I only expressed |
| 3  that as being a salient issue at all.  So | 3  uncertainty about what position we at DSS |
| 4  how -- you know, how the issue of drug | 4  would take in the upcoming court case on |
| 5  use played in this case, I don't remember | 5  custody given the outstanding uncertainties |
| 6  as being a salient issue. | 6  about both mother and father." |
| 7      So I may have had -- someone may | 7      And if I'm being repetitive, I |
| 8  have mentioned it to me.  I may have | 8  don't mean to be, Commissioner.  What |
| 9  dismissed it because of what someone said. | 9  uncertainties did you have about the |
| 10  But you know, Alaska says no I don't | 10  father, other than this tribal |
| 11  remember.  What I remember is it was not | 11  jurisdictional question.  But what other |
| 12  a salient issue. | 12  uncertainties did you have about the |
| 13    Q.  Well, let me ask you this:  If in | 13  father's fitness as a parent? |
| 14  this particular case you had had some | 14    A.  The other uncertainty I personally |
| 15  credible information that Mr. Chaplin was | 15  had was about this question about whether |
| 16  a drug user -- | 16  there was an illegal adoption that might |
| 17    A.  Mm-hmm. | 17  be being sought by the father. |
| 18    Q.  -- would the department have formed | 18    Q.  Okay.  And I'm sorry, you've |
| 19  that as a basis to contest jurisdiction -- | 19  testified to that before. |
| 20  contest custody be awarded to Mr. Chaplin? | 20    A.  Yes.  That's right. |
| 21    A.  We don't automatically exclude some | 21    Q.  So other than those two factors -- |
| 22  history of drug use as meaning excluding | 22    A.  Those two I remember as the -- as |
| 23  someone from being a fit parent.  But it | 23  the concerns that -- that led me to |
| 24  certainly raises -- immediately raises | 24  support the staff in their -- in their |



**Jack Daniel**
Court Reporting & Video Services

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

|     | 101 |
|-----|-----|
| 1 | recommendation that we resist the custody |
| 2 | and petition of the father. |
| 3 | Q.  And again at that time you had not |
| 4 | seen the affidavits marked as Exhibits 3 |
| 5 | and 4 -- |
| 6 | A.  That's right. |
| 7 | Q.  -- and were unaware of their |
| 8 | existence? |
| 9 | A.  I believe -- Well, no.  That's |
| 10 | fine.  Yep. |
| 11 | MR. McCORMICK:  I have |
| 12 | nothing further. |
| 13 | MR. WYZANSKI:  I have no |
| 14 | questions. |
| 15 | MR. McCORMICK:  Thank you. |
| 16 | THE DEPONENT:  My apologies |
| 17 | for being late, on a Friday afternoon. |
| 18 | MR. McCORMICK:  No problem. |
| 19 | (Deposition of LEWIS H. |
| 20 | SPENCE concluded at 4:27 p.m.) |
| 21 | . |
| 22 | . |
| 23 | . |
| 24 | . |

|     | 103 |
|-----|-----|
| 1 | COMMONWEALTH OF MASSACHUSETTS |
| 2 | |
| 3 | I, LAUREN SULLIVAN, A Professional |
| 4 | Shorthand Reporter and Notary Public in |
| 5 | and for the Commonwealth of Massachusetts, |
| 6 | do hereby certify that the witness whose |
| 7 | deposition is hereinbefore set forth was |
| 8 | duly sworn, and that such deposition is a |
| 9 | true record of the testimony given by the |
| 10 | witness. |
| 11 | I further certify that I am neither |
| 12 | related to or employed by any of the |
| 13 | parties in or counsel to this action, nor |
| 14 | am I financially interested in the outcome |
| 15 | of this action. |
| 16 | In witness whereof, I have hereunto set |
| 17 | my hand and seal this    day of |
| 18 | 2006. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|     | 102 |
|-----|-----|
| 1 | DESCRIPTION OF EXHIBITS |
| 2 | EXHIBIT DESCRIPTION |
| 3 | 1      Article printed in the Boston Globe |
| 4 | 2      Letter to the Editor printed in |
| 5 | the Boston Globe |
| 6 | 3      Affidavit of Katherine Porter |
| 7 | 4      Affidavit of Margaret Cunnane Hall |
| 8 | 5      Letter from Mr. McCormick |
| 9 | 6      Answers to Interrogatories |
| 10 | . |
| 11 | . |
| 12 | . |
| 13 | . |
| 14 | . |
| 15 | . |
| 16 | . |
| 17 | . |
| 18 | . |
| 19 | . |
| 20 | . |
| 21 | . |
| 22 | . |
| 23 | . |
| 24 | . |

|     | 104 |
|-----|-----|
| 1 | Lauren Sullivan |
| 2 | Notary Public |
| 3 | My commission expires October 5, 2012 |
| 4 | CAPTION |
| 5 | The Deposition of Lewis H. Spence, |
| 6 | taken in the matter, on the date, and at the |
| 7 | time and place set out on the title page |
| 8 | hereof. |
| 9 | It was requested that the deposition |
| 10 | be taken by the reporter and that same be |
| 11 | reduced to typewritten form. |
| 12 | It was agreed by and between counsel |
| 13 | and the parties that the Deponent will read |
| 14 | and sign the transcript of said deposition. |
| 15 | . |
| 16 | . |
| 17 | . |
| 18 | . |
| 19 | . |
| 20 | . |
| 21 | . |
| 22 | . |
| 23 | . |
| 24 | . |


**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use • Experience you can Trust

Direct Dial:       617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:     866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

105

```
 1          .
 2          .
 3          .
 4          DEPOSITION ERRATA SHEET
 5          .
 6   RE:      Jack Daniel Court Reporting
 7   File No.    2400
 8   Case Caption:  James Chaplin Vs.
 9               Lewis H. Spence, et al.
10
11   Deponent:    Lewis H. Spence
12   Deposition Date: July 21, 2006
13   To the Reporter:
14   I have read the entire transcript of my
15   Deposition taken in the captioned matter or
16   the same has been read to me. I request
17   that the following changes be entered upon
18   the record for the reasons indicated. I
19   have signed my name to the Errata Sheet and
20   authorize you to attach to the original
21   transcript.
22          .
23       Page No.   Line No.   Change to:
24
```

107

```
 1
 2   Reason for change:
 3   Page No.   Line No.   Change to:
 4
 5   Reason for change:
 6       No changes made to the Errata Sheet
 7       I am returning this signed Errata
 8   Sheet with changes noted.
 9   Under penalties of perjury, I declare that I
10   have read the foregoing transcript and that
11   the facts stated in it are true.
12   SIGNATURE:          DATE:
13       Lewis H. Spence
```

106

```
 1       Reason for change:
 2       Page No.   Line No.   Change to:
 3
 4       Reason for change:
 5       Page No.   Line No.   Change to:
 6
 7       Reason for change:
 8       Page No.   Line No.   Change to:
 9
10       Reason for change:
11       Page No.   Line No.   Change to:
12
13       Reason for change:
14       Deposition of Lewis H. Spence
15       Page No.   Line No.   Change to:
16
17       Reason for change:
18       Page No.   Line No.   Change to:
19
20       Reason for change:
21       Page No.   Line No.   Change to:
22
23       Reason for change:
24       Page No.   Line No.   Change to:
```



**JACK DANIEL**
**Court Reporting & Video Services**
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114